UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 1:17-c22477-Civ-Williams/Torres

GARLAND CREEDLE,

        Plaintiff,

v.

CARLOS A. GIMENEZ, in his official capacity as Mayor of Miami-Dade County, Florida; and MIAMI-DADE COUNTY, Florida,

        Defendants.

## BRIEF OF AMICUS CURIAE IMMIGRATION REFORM LAW INSTITUTE IN SUPPORT OF DEFENDANTS AND DISMISSAL

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | STATEMENT OF THE FACTS | 3 |
| II. | SUMMARY OF THE ARGUMENT | 4 |
| III. | ARGUMENT | 6 |
| | A. Congress, Pursuant To Its Plenary Power Over Immigration, Has Authorized Immigration And Customs Enforcement (ICE) To Enforce Immigration Laws By Detaining Individuals | 6 |
| | B. Under The Special Needs Doctrine, ICE Can Constitutionally Arrest And Detain Individuals Suspected Of Being In The United States Illegally | 7 |
| | C. Generally, States Do Not Violate The Fourth Amendment By Assisting The Federal Government In Detaining Individuals Thought To Be In The United States Illegally. | 11 |
| | 1. Under 8 U.S.C. § 1357(g)(10)(B), state and local jurisdictions may cooperate with ICE officials in detaining aliens. | 11 |
| | 2. Generally, state and local officials are entitled to rely on probable cause determinations made by the federal government in detainer requests. | 14 |
| | D. A Fourth Amendment Violation Does Not Lie Merely Because A Mistake Was Made In The Arrest Of An Individual. | 16 |
| IV. | CONCLUSION | 17 |

**I. STATEMENT OF THE FACTS**

On January 20, 2017, Carlos A. Gimenez, Mayor of Miami-Dade County, Florida, issued a memorandum instructing the Corrections and Rehabilitation Department "to honor all immigration requests received from the Department of Homeland Security" because the County "intend[ed] to fully cooperate with the federal government." Compl. Ex. A.  Following Mayor Gimenez's memorandum, on February 17, 2017, Miami-Dade County adopted Resolution R-163-17 to ensure compliance with detainer requests, provided they were supported by probable cause.  Mot. to Dismiss Ex. 2 at 6.

On March 12, 2017, Plaintiff was arrested on charges of aggravated battery on a pregnant woman.  Mot. to Dismiss at 4.  While Plaintiff was in Defendant County's custody, Defendant County received an Immigration and Customs Enforcement (ICE) detainer.  *Id.* at 5.  The detainer stated that "[p]robable cause exists that [Plaintiff] is a removable alien" because "biometric confirmation of [Plaintiff's] identity and a records check of federal databases . . . [reveals] that [Plaintiff] either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."  Compl. Ex. D.  Plaintiff is actually a United States citizen.  Compl. at 9.  Defendant County held Plaintiff pursuant to the ICE detainer until March 14, 2017, when ICE officials interviewed Plaintiff and discovered that he was a U.S. citizen.  *Id.* at 11.  At that point, ICE withdrew the detainer request and Plaintiff was released on bond.  *Id.*

On March 24, 2017, ICE issued a policy on detainers to ensure detainers were "consistent with legal requirements."  U.S. Immigration and Customs Enforcement, *Policy No: 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers* 1 (Mar. 24, 2017).  The policy requires Form-247A (Immigration Detainer – Notice of Action) as well as Form I-200 (Warrant for Arrest of Alien) or Form I-205 (Warrant for Removal/Deportation).  *Id.* at 2.  The required

forms are issued by an ICE immigration officer and must be based on probable cause beyond evidence of foreign birth or absence of records in an available database.  *Id.*  Under this policy, biometric information is considered an acceptable means for establishing probable cause.  *Id.* at 4.

## II.  SUMMARY OF THE ARGUMENT

Under the Fourth Amendment to the U.S. Constitution, the American people are protected against unreasonable searches or seizures.  Generally, for a criminal arrest to be reasonable under the Fourth Amendment, case law has established that a warrant issued by a neutral and detached magistrate, and based on probable cause to believe a crime has been committed, or else a police officer's warrantless possession of probable cause combined with exigent circumstances, is required.  Yet outside of the criminal-arrest context, the Fourth Amendment's requirement of reasonableness applies differently.  Specifically, the U.S. Supreme Court has developed a test for determining when "special needs" make a seizure outside of that context reasonable.

When federal immigration officers, in accordance with applicable statutes and regulations, detain aliens for the civil infraction of being in the country unlawfully, in order to commence removal proceedings against them, they pass this test with flying colors.  The need for the United States to be able to expel aliens here against its laws is the most special of special needs, rooted in the undoubted sovereign right of the nation to control its borders, and the federal government has developed a reasonable process, suited to this need, for detaining and removing such aliens.  And an illegal alien, who lacks a right to be inside the borders of the United States, has at most a reduced right, enforceable against the government, to move freely inside this country.  Indeed, so obvious is the proposition that federal immigration authorities' enforcement

of immigration laws through detention prior to removal is congruent with the Fourth Amendment that not even Plaintiff appears to have contested it; certainly, he has not elected to bring suit against any federal entity.

Rather, Plaintiff challenges Defendants' policy of assisting the federal government, when asked, in the detention of aliens believed unlawfully present in the country. But for a state sovereign merely to assist the federal government, under its direction, in carrying out activities that comply with the Fourth Amendment when the federal government does them without assistance—here, detaining illegal aliens in order to remove them from the country—also is not unreasonable under the Fourth Amendment. Indeed, pursuant to federal statutes, states routinely cooperate with the federal government in detentions in the criminal-arrest context. When such cooperation occurs, the state acts reasonably, and complies with the Fourth Amendment, when it reasonably relies on the evidentiary determinations of the federal government. So, too, here; through the detainer process, states receive information sufficient for reasonable reliance on ICE's probable cause determination.

Finally, under any evidentiary standard that is compliant with the Fourth Amendment, short of one requiring absolute certitude, mistaken detentions are inevitable. Such mistakes, when reasonable, are not Fourth Amendment violations. Defendants' policy, by requiring that an officer accede to a detainer request only if it is supported by probable cause, ensures that acceding to such requests, even when, as here, they are based on a mistake about the immigration status of a detainee, will not be unreasonable. For this reason, Defendants' policy does not violate the Fourth Amendment. And the complaint in this action contains no allegation from which it can be inferred that the police officers who acceded to the federal government's request had sufficient information to dissipate probable cause arising from the federal government's

statement that biometric information indicated that Plaintiff was a removable alien. Thus, Defendants did not violate Plaintiff's Fourth Amendment rights by detaining him.

**III. ARGUMENT**

    A. Congress, Pursuant To Its Plenary Power Over Immigration, Has Authorized Immigration And Customs Enforcement (ICE) To Enforce Immigration Laws By Detaining Individuals.

The federal government has plenary power over immigration derived from its powers over naturalization and foreign affairs, and also from the inherent rights of the United States as a sovereign nation. *Arizona v. United States*, 567 U.S. 387, 394-96 (2012). Congress created a comprehensive immigration statutory scheme in the Immigration and Nationality Act (INA), which charges the Secretary of the Department of Homeland Security (DHS) with the "administration and enforcement" of immigration laws and the promulgation of regulations as necessary. 8 U.S.C. § 1103(a)(1), (a)(3). Recognizing that immigration enforcement extends from the border into the interior of the country, Congress provided geographically nonspecific authority to DHS to arrest and detain certain aliens, both with and without warrants. 8 U.S.C. §§ 1226(a), 1231, 1357; *see also Comm. for Immigrant Rights v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 197-99 (N.D. Cal.) (recognizing the authority of the agency to use detainers outside of the controlled substance violations context). Specifically, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed . . . ." 8 U.S.C. § 1226(a).[1] Furthermore, Congress has provided an immigration officer or employee with the power to arrest and detain aliens without a warrant when there is reason to believe the alien is in the country illegally and that the alien is likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a), (d).

---

[1] The responsibilities of the Attorney General were transferred to the Department of Homeland Security. 6 U.S.C. §§ 202, 291, 557.

6

B. Under The Special Needs Doctrine, ICE Can Constitutionally Arrest And Detain Individuals Suspected Of Being In The United States Illegally.

The Fourth Amendment provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the . . . the persons or things to be seized." U.S. Const. Amend. 4. Thus, "the touchstone of the Fourth Amendment is reasonableness . . . . Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (internal quotation and citation omitted).

For criminal arrests, the Fourth Amendment has been interpreted generally to require either a warrant issued by a neutral and detached magistrate and based on probable cause that a crime has been committed or, in exigent circumstances, a police officer's warrantless possession of probable cause. *Terry v. Ohio*, 392 U.S. 1 (1968).

Yet outside of the criminal-arrest context, the Fourth Amendment's requirement of reasonableness is applied differently. *See, e.g.*, *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981) (holding that a civil, executive warrant to search a commercial business for immigration purposes met Fourth Amendment standards). Specifically, the Supreme Court developed the special needs doctrine for areas where applying requirements suitable in the criminal-arrest context would be unreasonable. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) (applying the special needs doctrine to the search of a high school student on school grounds). Under the special needs doctrine, a search or seizure can be constitutional "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (holding that drug testing student athletes fell under the special needs doctrine). The

7

Supreme Court has applied the special needs doctrine to both searches and seizures. *See, e.g., id; New Jersey v. T.L.O.*, 469 U.S. 325 (1985) (holding that a search for cigarettes by school officials fell within the special needs doctrine); *New York v. Burger*, 482 U.S. 691 (1987) (permitting administrative inspections in "closely regulated" industries); *Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602 (1989) (allowing the coerced drug testing of railroad employees after an accident under the special needs doctrine). Under the special needs doctrine, a seizure's compliance with the Fourth Amendment depends on "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. 47, 51 (1979). *See also, e.g., Illinois v. Lidster,* 540 U.S. 419, 426-28 (2004) (balancing these factors in finding a checkpoint stop reasonable); *Mich. Dep't. of State Police v. Sitz,* 496 U.S. 444 at 450-55 (1990) (same); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-64 (1976) (same).

Consideration of these factors shows unmistakably that federal seizures of illegal aliens comport with the Fourth Amendment. To start with the third factor—the severity of the interference with individual liberty—it is true that, when an individual is held pursuant to a detainer, his individual liberty is severely interfered with. But an illegal alien's right to individual liberty within the borders of this country is severely circumscribed to begin with. Such an alien has no right to be in the country at all, and thus, at most, a reduced right to move about freely within it. As a U.S. House of Representatives conference committee report in 1996 stated: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and illegal aliens do not have the right to remain in the United States undetected and unapprehended." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.). *See also League of United Latin Am. Citizens v. Bredesen*, No. 3:04-0613, 2004 U.S. Dist. LEXIS 26507 (M.D.

8

Tenn. Sept. 28, 2004) (rejecting a challenge, premised on the right to travel, to a state law barring illegal aliens from possessing drivers' licenses; "given their status, illegal aliens do not have a constitutional right to move freely about the country or the state"); *John Doe No. 1 v. Ga. Dep't of Pub. Safety,* 147 F. Supp. 2d 1369, 1374 (N.D. Ga. 2001) ("[T]he right to travel is derived from federal citizenship. Regardless of which passage in the Constitution the right to travel emanates from, the obvious correlation to national citizenship is fatal to Plaintiff's argument that a fundamental right is at stake in his entitlement to a Georgia driver's license. Plaintiff's presence in this country is unlawful. In fact, it would be a federal crime for someone knowingly to transport Plaintiff within the United States. 8 U.S.C. § 1324(a)(1)(A)(ii)."). And, *a fortiori,* even with respect to lawful permanent resident aliens, the Supreme Court has repeatedly held that Congress may make rules impacting their liberty interests that would be unacceptable if made for citizens. *Demore v. Kim,* 538 U.S. 510, 521-22, 531 (2003) (holding that the detention of a deportable lawful permanent resident prior to removal did not violate due process), *and cases cited therein.*

The other special needs factors—the gravity of the public concerns served by the seizure, and the degree to which the seizure advances the public interest—militate strongly in favor of reasonableness. As the Supreme Court has found with respect to criminal aliens (a large subset of aliens subject to detainers):

> Congress adopted [§ 1226(c), providing for the detention of criminal aliens] against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens. See, *e.g.,* Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993); S. Rep. No. 104-48, p 1 (1995) (hereinafter S. Rep. 104-48) (confinement of criminal aliens alone cost $ 724 million in 1990). Criminal aliens were the fastest growing segment of the federal prison population, already constituting roughly 25% of all federal prisoners, and they formed a rapidly rising share of state prison populations as well. *Id.,* at 6-9. Congress' investigations showed, however, that

9

>   the INS could not even *identify* most deportable aliens, much less locate them and remove them from the country. *Id.,* at 1. One study showed that, at the then-current rate of deportation, it would take 23 years to remove every criminal alien already subject to deportation. *Id.,* at 5. Making matters worse, criminal aliens who were deported swiftly reentered the country illegally in great numbers. *Id.,* at 3.
>
>   The agency's near-total inability to remove deportable criminal aliens imposed more than a monetary cost on the Nation. First, as Congress explained, "aliens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others." S. Rep. No. 104-249, p 7 (1996). Second, deportable criminal aliens who remained in the United States often committed more crimes before being removed. One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45% – nearly half – were arrested multiple times before their deportation proceedings even began. Hearing on H. R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989) (hereinafter 1989 House Hearing); see also *Zadvydas [v. Davis],* 533 U.S. [678], 713-714, 150 L. Ed. 2d 653, 121 S. Ct. 2491 [(2001)] (Kennedy, J., dissenting) (discussing high rates of recidivism for released criminal aliens).

*Kim,* 538 U.S. at 518-519.

More generally, a sovereign nation has the power to regulate foreign policy, *Arizona*, 567 U.S. at 395, and that power includes the sovereign's power to protect itself by determining who is within its borders unlawfully and removing them. *Harisiades v. Shaughnessy*, 342 U.S 580, 587-88 (1952) ("[Expulsion] is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign state."). It is paradigmatically in the public interest for this nation to retain its full sovereign right to control its borders, and that right is meaningless without the power to exercise it. Currently, there are an estimated 12.5 million illegal aliens in the United States. Matthew O'Brien, Spencer Raley & Jack Martin, *The Fiscal Burden of Illegal Immigration on United States Taxpayers (2017)* 3, Fed'n for Am. Immigration Reform (2017), https://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf. If more stringent requirements than those in current law were imposed on their detention by federal

agents—such as a requirement for a judicial warrant—the ability of this country to enforce its immigration laws, as a practical matter, would be at an end.

For these reasons, the detention of illegal aliens by federal agents pursuant to current federal law does not violate the Fourth Amendment. *See, e.g.*, *Au Yi Lau v INS*, 445 F.2d 217, 224 (D.C. Cir. 1971) (finding probable cause for the warrantless arrest of illegal aliens who had told immigration officers they had "jumped ship" and had attempted to flee when approached).

C. Generally, States Do Not Violate The Fourth Amendment By Assisting The Federal Government In Detaining Individuals Thought To Be In The United States Illegally.

1. Under 8 U.S.C. § 1357(g)(10)(B), state and local jurisdictions may cooperate with ICE officials in detaining aliens.

Federal law provides for voluntary cooperation by state and local authorities with the federal government in the detention of aliens. It also provides for such cooperation in federal criminal law enforcement. The standard for whether either kind of cooperation is reasonable under the Fourth Amendment is whether the state or local authorities have reasonably relied on the probable cause determination of the federal government. Because it is reasonable for state or local authorities to rely on the probable cause determinations of the federal government in detainer requests, state or local authorities do not violate the Fourth Amendment by complying with such requests.

Through statute, Congress has provided a means by which state or local officials may assume the functions and powers of an immigration officer, and separately provided that they may cooperate with federal immigration officers without assuming those functions or powers. 8 U.S.C. § 1357(g)(1) outlines how state and local law enforcement officers may perform immigration officer functions. The U.S. Attorney General, through ICE, may enter into written

11

agreements with state and local law enforcement officers to perform immigration officer functions related to investigation, apprehension, or detention. 8 U.S.C. § 1357(g)(1)-(2).

If a state or local employee or officer merely "cooperates" with federal officials, however, no written agreement is necessary. *Id.* at § 1357(g)(10)(B). Without such an agreement, state and local law enforcement officers may cooperate with ICE in the identification, apprehension, detention, or removal of aliens. *Id.*

The term "cooperate" in § 1357(g)(10)(B) is not defined by statute. DHS, however, has provided guidance on its meaning:

> [T]he Department interprets the term "cooperate" in subparagraph 1357(g)(10)(B) to mean the rendering of assistance by state and local officers to federal officials, in the latter officials' enforcement of the [Immigration and Nationality Act], in a manner that maintains the ability to conform to the policies and priorities of DHS and that ensures that individual state and local officers are at all times in a position to be—and, when requested, are in fact—responsive to the direction and guidance of federal officials charged with implementing and enforcing the immigration laws.

Dep't of Homeland Sec., *Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters* 7 (2011), https://www.dhs.gov/xlibrary/assets/guidance-state-local-assistance-immigration-enforcement.pdf.

Whether an action by state or local officials constitutes enforcement or cooperation turns on whether the conduct is undertaken unilaterally or at the request of ICE. Unilateral action by state or local officials in the area of immigration, to be done correctly, requires specialized training. *Arizona*, 567 U.S. at 409 ("There are significant complexities involved in enforcing federal immigration law, including the determination of whether a person is removable. As a result, agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer."). Thus, actions performed without "express direction or authorization by federal statute or federal

officials" do not constitute cooperation, but rather enforcement requiring a Memorandum of Understanding.  *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013) (determining that the unilateral seizure of an alien prior to ICE's direction was unconstitutional); *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164-65 (8th Cir. 2014) (holding that the acts of identifying an illegal alien, communicating with immigration officials, and detaining the illegal alien until immigration official could take custody were not unilateral in nature and did not require a written agreement); *United States v. Quintana*, 623 F.3d 1237, 1242 (8th Cir. 2010) (holding that a state officer could, under § 1357(g)(10)(B) detain an alien at the request of ICE and maintain custody until ICE could take the alien the following day).  By this test, if an action is performed at the express direction of or with express authorization by ICE, it constitutes cooperation rather than enforcement.

Congress invited state and local officials to participate and cooperate in immigration enforcement, not just through § 1357(g)(10), but other sections in the INA as well.

> Effective immigration law enforcement requires a cooperative effort between all levels of government.  The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purpose and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996).  Section 1252c authorizes state and local law enforcement to arrest and detain illegal aliens who have previously been convicted and deported or left the United States.  8 U.S.C. § 1252c; *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1298-99 (10th Cir. 1999) (discussing state and local officers involvement in immigration arrests and detentions).  Additionally, 8 U.S.C. § 1324(c) allows state and local arrest aliens who bring and harbor other aliens.  "This collection of statutory provisions evinces a clear invitation from

13

Congress for state and local agencies to participate in the process of enforcing federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at 1300.

Detaining individuals pursuant to detainers is not unilateral conduct and is properly categorized as cooperation. After an individual is arrested, the local jurisdiction communicates with immigration officials. 8 U.S.C. § 1357(g)(10)(A). ICE makes the determination of whether there is probable cause to believe that the person is in the country illegally through objective means such as biometric information. If there is probable cause, ICE then initiates the detainer, a request to the local jurisdiction to cooperate in detaining the individual for an additional 48 hours. The local jurisdiction cannot not act without ICE's detainer; therefore, the local jurisdiction does not make a unilateral decision about the individual's immigration status or removability. This process clearly falls within the statutory language of 8 U.S.C. § 1357(g)(10)(B), and is cooperation.

2. Generally, state and local officials are entitled to rely on probable cause determinations made by the federal government in detainer requests.

The cooperation of state or local authorities with the federal government in honoring detainers generally comports with the Fourth Amendment for at least two reasons. To begin with, any finding that the laws authorizing such cooperative assistance are unconstitutional would conflict with the Supreme Court's holding in *Arizona* that these very laws preempted, under the Constitution's Supremacy Clause, Arizona's law conferring power on its state officers to enforce immigration laws unilaterally. *See Arizona*, 567 U.S. at 410. If unconstitutional, these federal laws would lack the preemptive force the Supreme Court ascribed to them, since only those laws "made in Pursuance" of the Constitution are "the supreme Law of the Land." Art. VI, cl. 2.

Secondly, where, as here, federal law authorizes state cooperation in federal law enforcement, such cooperation is not contrary to the Fourth Amendment if state officials reasonably rely on information provided by the federal government. For example, under the Interstate Agreement on Detainers Act, states may take custody, at the request of the federal government, of persons the federal government believes have violated federal criminal law. *See* Interstate Agreement on Detainers Act., Pub. L. 91-538, 84 Stat. 1397 (1970); Fla. Stat. § 941.45.

When state officials detain such individuals pursuant to this law, they do not violate the Fourth Amendment if they reasonably rely on information provided by the federal government. Under the shared knowledge doctrine, the knowledge of an investigating officer is imputed to each officer participating in an arrest. *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012). The arresting officer may rely, if it is reasonable to do so, on the probable cause gathered by other officers to arrest a suspect. *Id.* (citation omitted). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986).

By the same token, when state or local officials make an arrest or detain an individual for a federal offense, they are entitled to rely on information pertaining to probable cause provided by the federal government. Such reliance is especially reasonable in areas where the federal government possesses special expertise or sources of information that the state or local officials lack. For example, federal law provides that "[a]ny civil officer having authority to apprehend offenders under the laws of the United States or of a State, Commonwealth, possession, or the

15

District of Columbia may summarily apprehend a deserter from the armed forces and deliver him into the custody of those forces." 10 U.S.C. § 808.  Under this law, when the information that an individual is a deserter comes from federal military authorities, local officials are entitled to rely on it.  *See, e.g., State v. Somfleth,* 492 P.2d 808, 809-11 (Or. Ct. App. 1972) (holding that when state police arrested a motorist after receiving information from military authorities that he was a deserter, the arrest was valid under the Fourth Amendment because the police were entitled to rely on that information, even though it later turned out to be inaccurate).

The same holds for compliance with detainer requests.  Federal officials have special expertise, which state and local officials lack, in determining whether an individual is in the country illegally, and local officials complying with such a request are entitled to rely on the information provided by federal authorities.  *See, e.g., People v. Xirum*, 993 N.Y.S. 2d 627, 631 (N.Y. Sup. Ct. 2014) ("[T]he [Department of Corrections] had the right to rely upon the very federal law enforcement agency charged under the law with the identification, apprehension, and removal of illegal aliens from the United States") (internal quotation omitted).

D. A Fourth Amendment Violation Does Not Lie Merely Because A Mistake Was Made In The Arrest Of An Individual.

The detainer policy in place in Miami-Dade County when Plaintiff was detained provided that only detainers supported by probable cause were to be complied with.  *See* Mot. to Dismiss 4, 4 n.6.  This policy was not unconstitutional.  As explained above, local officials are entitled to rely on federal determinations of probable cause of removability, at least absent further evidence dissipating such probable cause.  Because Miami-Dade's policy allowed—indeed, commanded—officers not to comply with detainers where there was such dissipating evidence, the policy did not mandate unconstitutional compliance.

Also, that Plaintiff was a U.S. citizen did not render his detention unconstitutional. Under any Fourth Amendment-compliant evidentiary standard for detaining someone, short of a standard requiring absolute certitude, detentions of innocent persons are statistically inevitable. This is especially so for a standard as low as probable cause. Such mistakes, when reasonable, are not Fourth Amendment violations. *See, e.g.*, *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002) (finding no Fourth Amendment violation in an arrest based on mistaken identity even where the description of the suspect did not precisely match the person arrested). Rather, under the reasonable mistake standard, a court will examine what information the officer had at the time of arrest and determine if the mistake was reasonable in light of the circumstances. *See id.* at 1347-48. Here, Plaintiff fails to make any allegation that Defendants knew or had reason to know of any facts that would have rendered their reliance on ICE's probable cause determination that he was removable unreasonable. Since, absent such knowledge, Defendants were entitled to rely on that probable cause determination, their detention of Plaintiff did not violate the Fourth Amendment. *See Somfleth,* 492 P.2d at 808, 809-11 (Or. Ct. App. 1972).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Fourth Amendment claims should be granted.

Dated: September 29, 2017

    Respectfully submitted,

    <u>/s/ **Lesley Blackner**</u>
    Lesley Blackner
    Florida Bar No. 654043
    340 Royal Poinciana Way, Suite 317-377
    Palm Beach, Fl 33480
    (561)659-5754
    lesleyblackner@gmail.com

Christopher J. Hajec
Elizabeth A. Hohenstein
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Avenue, NW
Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org
ehohenstein@irli.org

Attorneys for *Amicus Curiae*