GARLAND CREEDLE,
  Plaintiff,             v.

CARLOS A. GIMENEZ, in his official
capacity as Mayor of Miami-Dade County,      Case No.: 17-22477-Civ-Williams
Florida; and MIAMI-DADE COUNTY,
Florida,
  Defendants.

_____/

## PLAINTIFF'S OPPOSING MEMORANDUM OF LAW TO MOTION TO DISMISS

Plaintiff Garland Creedle files this opposing memorandum of law to the County's motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6). When reviewing a Rule 12(b)(6) motion to dismiss, "the pleadings are construed broadly" and "the allegations in the complaint are viewed in the light most favorable to the plaintiff." *Watts v. Fla. Int'l Univ.*, 495 F.2d 1289, 1295 (11th Cir. 2007) (citations omitted). In an effort to evade liability, the County mischaracterizes Mr. Creedle's claims, arguing that he is challenging a County policy to detain U.S. citizens based on immigration detainers. Mr. Creedle does not allege that the County has a policy of detaining U.S. citizens. Mr. Creedle alleges that the County has an unlawful policy and practice of voluntarily detaining people after the criminal basis of their custody has ended at the request of Immigration and Customs Enforcement ("ICE"). Even if Mr. Creedle were not a U.S. citizen, the County's actions would be unlawful. Because Mr. Creedle challenges the County's decision to seize people for ICE, it is no defense for the County to assert that the detainer request appeared "facially valid."

The County's policy and practice began on January 26, 2017, when Mayor Gimenez issued a written memorandum instructing correctional officers to "honor all ICE detainers." D.E. 1 at 8. As of that date, County correctional officers began an across-the-board practice of detaining people on ICE detainers. The County Board of Commissioners then passed a resolution ratifying the decision of the

Mayor. *Id.* at ¶ 37. The announced policy reversed three years of a contrary policy, established by resolution, under which the County would only agree to hold people for ICE under limited circumstances. D.E. 1 at 2-3, 6-9. The County's conscious choice to begin honoring ICE detainer requests—including the Gimenez memorandum and subsequent County Board vote ratifying the directive—was a radical and controversial break from prior policy.

As illustrated by the County's voluntary act of reversing its detainer policy, nothing requires the County to detain people for ICE. The County acknowledges that it makes a choice when it holds people after their criminal custody comes to an end. Co. Atty. Mem. at 6 ("Ex. 1") (noting that any municipal enforcement of immigration law must be "voluntary"); *see also Galarza v. Szalczyk*, 745 F.3d 634, 639-45 (3d Cir. 2014). As the County concedes, the Tenth Amendment prohibits the federal government from compelling the County to detain people. Ex. 1. at 5. The County's conscious choice to detain Mr. Creedle under its policy and practice of honoring all ICE detainers is the driving force of his unlawful detention.

**I.      The County lacked authority to detain Mr. Creedle after his criminal custody ended.**

The County does not dispute that its decision to continue to detain Mr. Creedle after receiving the immigration detainer request amounted to a subsequent seizure under the Fourth Amendment and Florida state law. *See, e.g., Morales v. Chadbourne*, 793 F.3d 208, 217 n.3 (1st Cir. 2015). The County also does not claim any inherent authority to arrest or detain Mr. Creedle for suspected immigration violations. Rather, the County suggests that federal and state law authorized it to arrest and detain Mr. Creedle after he posted bond in his criminal case. The County is mistaken. Neither federal nor state law authorized the County's re-arrest and detention of Mr. Creedle after he posted bond in his criminal case.

**A.  No federal law authorized the County's post-bond detention of Mr. Creedle.**

The County argues that its arrest of Mr. Creedle was made pursuant to a delegation of federal immigration enforcement authority. But far from authorizing the County's blanket policy of honoring

immigration detainers, federal law imposes clear limitations on participation in federal immigration enforcement – limitations that the County exceeded by re-arresting and holding Mr. Creedle. Because no federal statute authorized the County's detention of Mr. Creedle, the Court should reject the County's efforts to evade responsibility for the consequences of its policy on immigration detainers.

The Immigration and Nationality Act ("INA") establishes a comprehensive federal scheme for immigration regulation. The INA confers immigration arrest and detention authority on certain *federal* immigration law enforcement officials. *See* 8 U.S.C. § 1357(a) (2012).[1] State and local governments are not permitted to enforce civil immigration laws unless Congress has expressly granted such authorization. *Arizona v. United States*, 567 U.S. 387, 407-10 (2012). Congress has authorized state and local law enforcement officers ("LEAs") to participate in immigration enforcement only in "limited circumstances" that are carefully set out in applicable statutes, none of which permit the County's conduct here. *See Arizona*, 567 U.S. at 408-09 (citing 8 U.S.C. §§ 1357(g)(1); 1103(a)(10); 1252c).[2]

The County argues its authority to arrest and detain persons for suspected civil immigration violations derives from 8 U.S.C. § 1357(g), which governs the limited circumstances in which LEAs may arrest someone for a suspected civil immigration violation. This statute authorizes federal immigration officials to contract with LEAs to allow them to "perform a function of an immigration officer," including the "apprehension" and "detention" of noncitizens, and only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). Participation in these "287(g) agreements" requires a written contract and certification by the federal government that the LEAs deputized to perform immigration enforcement functions are "qualified to perform" them and that the LEAs receive "adequate training"

---

[1] The regulations list the *federal* officials authorized to make warrantless arrests and arrests based on warrants. 8 C.F.R. §§ 287.5(c), 287.5(e)(3).

[2] The one reference to detainers in the INA, 8 U.S.C. § 1357(d), only authorizes requests for notification of an individual's pending release from criminal custody, not detention. *Arizona*, 567 U.S. at 410. The only statutory authority extended to LEAs that is arguably relevant to arrests based on immigration detainers is 8 U.S.C. § 1357(g). The other two limited circumstances involve a declared "mass influx," 8 U.S.C. § 1103(a)(10), and arrests of previously deported felons with warrants of removal. *Id.* at § 1252c.

on federal immigration law. *See id.* at § 1357(g)(2). The County does not have a 287(g) agreement with the federal government, and the Mayor stated publically that he would oppose such an agreement.[3]

The County also suggests 8 U.S.C. § 1357(g)(10) as a source of statutory authority to arrest Mr. Creedle.[4] But that subsection simply explains that the *other* express provisions in § 1357(g) (none of which remotely authorize the County's actions here) should not "be construed to require an agreement" for local officials to "communicate . . . regarding the immigration status of any individual" or "otherwise to cooperate" with the federal government on immigration enforcement matters. *Id.* at § 1357(g)(10). As the Supreme Court has recognized, "cooperation" in this context "include[s] situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities," *Arizona*, 567 U.S. at 410—not the outright arrest and detention of persons believed to be civil immigration violators.[5]

Unable to identify any statute that could authorize its seizure of Mr. Creedle, the County relies on a regulation, 8 C.F.R. § 287.7(d), as a source of detention authority. But that regulation does not authorize non-federal officers to conduct immigration arrests or detention. Instead, it instructs that

---

[3] *Miami-Dade Bd of Cty Comm'rs Minutes: Special Meeting* (2017)(statement of Mayor Gimenez), 1H (February 17, 2017), http://www.miamidade.gov/govaction/commminute.asp?cmbmeetdate=3905&file=true; *see also* Patricia Mazzei & Douglas Hanks, *Fearing Trump, commission drops Miami-Dade's sanctuary protections*, Miami Herald, Feb. 17, 2017, http://www.miamiherald.com/news/local/community/miami-dade/article133413384.html.

[4] The County also relies on 8 U.S.C. § 1357(g)(8). But this provision applies only to jurisdictions that have entered into 287(g) agreements. *See Santos v. Frederick Cty. Bd. of Com'rs*, 725 F.3d 451, 463 (4th Cir. 2013) (also noting the district court decision cited by Defendants in D.E. 11 at 13, was incorrect); Dep't Homeland Sec., *Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters*, at 7 (last published date July 16, 2015), https://www.dhs.gov/sites/default/files/publications/guidance-state-local-assistance-immigration-enforcement.pdf.

[5] *See also Ochoa v. Campbell*, No. 1:17-CV-03124-SMJ, 2017 WL 3476777, at *10 (E.D. Wash. July, 31 2017) (rejecting claim that § 1357(g)(10) provided valid basis for local arrest, despite ICE's request for assistance, and explaining that under the INA "state and local law enforcement and other officials are *presumed* to be unqualified and unable to perform the functions of federal immigration law enforcement officers"); *Dep't Homeland Sec.*, *supra* note 4, at 4 (making no reference to honoring immigration detainers as falling within the ambit of "cooperation" under § 1357(g)(10)).

4

jurisdictions in receipt of an immigration detainer must *limit* the length of any detention to a "period not to exceed 48 hours…." 8 C.F.R. § 287.7(d).[6] Indeed, the regulation itself states that "[d]etainers are issued pursuant to sections 236 and 287 of the [INA]," making plain that the regulation does not serve as some ultra vires source of authority for non-federal immigration enforcement. 8 C.F.R. § 287.7(a).

The County cannot establish that its detention of Mr. Creedle was authorized for an additional reason. Under the INA, even *federal* immigration agents may make warrantless arrests of persons suspected of civil immigration violations only in narrow circumstances: (1) where a noncitizen in the officer's "presence or view is entering or attempting to enter the United States" unlawfully; and (2) where the agent has "reason to believe" that the noncitizen is in the United States in violation of law *and* "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).[7] The County's arrest of Mr. Creedle does not fit within either of the narrow circumstances in which the INA authorizes warrantless arrests. Mr. Creedle was not "attempting to enter the United States" unlawfully in an officer's "presence or view." *Id.* Further, the arrest was made without any showing that there was reason to believe Mr. Creedle was "likely to escape before a warrant can be obtained for his arrest." *Id.* A warrantless arrest based on flight risk requires "an individualized assessment of the likelihood that a suspected removable alien, who is in the custody of an LEA, will seek to evade immigration officers upon release before a warrant can be obtained." *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1009 (N.D.

---

[6] *See, e.g., Galarza*, 745 F.3d at 640 (holding that the regulation's use of "'shall' serves only to inform an agency that otherwise decides to comply with an ICE detainer that it should hold the person no longer than 48 hours"). *See also Mercado v. Dallas Cty., Tex.*, 229 F. Supp. 3d 501, 513 (N.D. Tex. 2017) (rejecting local Government's claim that it 8 C.F.R. § 287.7(d) immunized it from liability for Fourth Amendment violation because regulation does not mandate detention); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 807 (N.D. Ill. 2014) ("[N]owhere does [8 C.F.R. § 287.7(d)] authorize the detention of an alien for 48 hours *after local custody over the detainee would otherwise end.*") (emphasis in original).

[7] These limitations on immigration arrest authority were established when the INA was first enacted, *see* Immigration and Nationality Act, Pub. L. No. 82-414, § 287, 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1357(a)(2), (4)) (permitting warrantless arrests only where the subject is "likely to escape before a warrant can be obtained for his arrest"), and they embody a "very carefully considered distinction between powers which may be exercised without warrant and such where a warrant will be required." H.R. REP. NO. 82-1365, at 55 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1710.

Ill. 2016). Yet ICE agents "'do not make any determination at all' with respect to this issue" before issuing the detainer request. *Id.* at 1006 (emphasis omitted).

**B.      No state law authorized the County's post-bond detention of Mr. Creedle.**

County correctional officers needed federal *and* state authority to lawfully detain Mr. Creedle for a civil immigration violation. They had neither. Without Florida law authority to detain Mr. Creedle, the County falsely imprisoned him. *See* Fla. Stat. § 787.02(1)(a); *see also Smart v. City of Miami*, 107 F. Supp. 3d 1271, 1281 (S.D. Fla. 2015) (referring to *Mathis v. Coats*, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010)). The County points to Fla. Stat. § 950.03 as a source of arrest authority—a statute that governs scenarios in which the federal government contracts with state prison or local jails to house people detained by the federal government. *Dyal v. State*, 386 So. 2d 868, 869 (Fla. 1st DCA 1980). Fla. Stat. § 950.03 directs that municipal jailers "shall receive into his or her custody any prisoner who may be committed to the keeper's charge under the authority of the United States." But Mr. Creedle was never a prisoner lawfully committed to the County's charge under the authority of the United States because he was never arrested by the federal government. An immigration detainer is not an arrest or seizure by the federal government under any definition. It is a request by the Department of Homeland Security ("DHS") that *another agency* make an arrest. *See Orozco v. U.S. I.N.S.*, 911 F.2d 539, 541 (11th Cir. 1990), *superseded by statute*, 8 U.S.C. § 1252(a)(5), (b)(9), *as recognized* in *Themeus v. U.S. Dept. of Justice*, 643 F. App'x. 830 (11th Cir. 2016) (for purposes of the custody requirement for habeas corpus proceedings, the filing of a federal detainer does not cause a person to come within the legal custody of the United States); *Gethers v. State*, 838 So. 2d 504, 507 (Fla. 2003) (quoting *Price v. State*, 598 So. 2d 215, 217 (Fla. 5th DCA 1992). Because the federal government never arrested Mr. Creedle, section 950.03 does not apply.

If Mr. Creedle were a federal prisoner housed by the County, federal law would have mandated that the federal government reimburse the County for the cost of his detention. 18 U.S.C. § 4007 ("[E]xpenses attendant upon the confinement of persons arrested or committed under the laws of the

United States . . . *shall* be paid out of the Treasury of the United States in the manner provided by law.") (emphasis added).[8] However, the County alone bore the cost of jailing Mr. Creedle. D.E. 1 at 7. Consistent with 18 U.S.C. § 4007, federal immigration regulations state that the federal government incurs no "fiscal obligation" from detainers until it assumes custody of the detainer's subject, absent an agreement for reimbursement. 8 C.F.R. § 287.7(e); 8 U.S.C. § 1103(a)(11)(B). No agreement between the County and the federal government existed at the time of Mr. Creedle's detention (or exists today). Even if the County had such an agreement, it would only provide the County with the authority to *house* federal detainees. It would not confer authority on the County to *arrest* suspected civil immigration violators. As noted above, detaining a person solely based on an immigration detainer constitutes a new warrantless arrest, which triggers the Fourth Amendment's protections. In contrast, mere transfers of detainees to a new detention location ordinarily do not trigger new liberty interests. *See, e.g.*, *McKeither v. Folino*, 540 F. App'x. 76, 78 (3d Cir. 2013); *Poirier v. Casperson*, 17 F. App'x. 460, 463-64 (7th Cir. 2001).

The County's claim that Fla. Stat. § 950.03 provided its correctional officers with the authority to detain Mr. Creedle on an immigration detainer would entail that the correctional officers were not only authorized but *required* to so detain him under Florida law. *See* Fla. Stat § 950.03 ("[E]ach county within this state *shall* receive into his or her custody any prisoner who may be committed to the keeper's charge under the authority of the United States . . .") (emphasis added). Such a conclusion would make Florida correctional officers who do not comply with immigration detainers guilty of a first-degree misdemeanor. Fla. Stat. § 839.21. This odd result strongly counsels against the County's interpretation of

---

[8] Similarly, Florida law provides that the United States pays the expenses of housing U.S. prisoners in county jails, just as any Florida county or municipality pays for the expenses of its prisoners when they are committed to the jails of other counties or municipalities. *See* Fla. Stat. §§ 950.04, 944.091; s*ee also* Fla. Stat. §§ 142.15, 950.01, 950.02, 951.23(6)(b), and 951.13.

Fla. Stat. § 950.03—a statute that was never intended to apply to civil immigration detainers, which were unheard of (for at least another hundred years) when it was first enacted in 1847.[9]

The County further claims it had authority to detain Mr. Creedle on an immigration detainer under Fla. Stat. § 901.18. This statute states that "[a] peace officer making a lawful arrest may command the aid of persons she or he deems necessary to make the arrest." Fla. Stat. § 901.18. The application of this statute to this case would entail that a DHS officer is a "peace officer" engaged in a "lawful arrest" and "command[ing]" County correctional officers to its aid. But, as noted above, the Tenth Amendment prohibits DHS from mandating compliance with a detainer request and a detainer is not an "arrest." *See* Fla. Stat. § 901.18.  It was the County—not DHS—that arrested Mr. Creedle.

The County has failed to rebut Mr. Creedle's allegations that it arrested Mr. Creedle without a warrant and that County correctional officers are not "law enforcement officers" authorized to make warrantless arrests under Florida law. *See* D.E. 1 at 13; *Pierre v. City of Miramar, Fla., Inc.*, 537 F. App'x. 821, 824-25 (11th Cir. 2013). Even if County correctional officers were considered "law enforcement officers" with warrantless arrest authority under Fla. Stat. § 901.15, nothing in this statute confers authority on correctional officers to arrest Mr. Creedle for a civil immigration violation pursuant to an immigration detainer. *See* D.E. 1 at 13.[10]

---

[9] Kate M. Manuel, *Immigration Detainers: Legal Issues*, Cong. Research Serv., R42690, May, 7, 2015, at 4, https://fas.org/sgp/crs/homesec/R42690.pdf; *see also Randolph v. Donaldson*, 13 U.S. 76, 79 (1815) (discussing the origins of a similar Virginia statute).

[10] Because there exists no citizen's right to arrest for civil immigration violations—which are neither felonies, nor breaches of the peace, nor misdemeanors observed in an officer's presence—County correctional officers also lacked the required arrest authority at Florida common law. *Cf. Phoenix v. State*, 455 So. 2d 1024, 1025 (Fla. 1984); *Thomas v. State*, 614 So. 2d 468, 470-72 (Fla. 1993) (holding that a full custodial arrest for violation of a municipal ordinance which was neither a crime nor a "noncriminal violation" under Florida statutes was unconstitutional under both the Fourth Amendment and Article I, section 12 of the Florida Constitution); *L.B.B. v. State*, 998 So. 2d 1217, 1218 (Fla. 2d DCA 2009) (holding that a bicycle infraction is noncriminal in nature and a person cannot be arrested for such infraction); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor *criminal* offense *in his presence*, he may, without violating the Fourth Amendment, arrest the offender.") (emphases added).

**II.     Mr. Creedle has sufficiently alleged that Miami-Dade County has a policy or practice of honoring ICE detainers that caused his post-bond detention.**

Mr. Creedle has sufficiently alleged that the County has a policy or practice of honoring the detainer requests of federal immigration authorities to hold jailed people beyond the end of their criminal custody. He has further alleged that this policy and practice—a voluntary action by the County—caused him to be detained after he paid his criminal bond (and should have been released). His allegations, taken as true, are sufficient to meet *Monell*'s requirement that a county policy or practice, as opposed to an individual's action, is a proximate cause of the alleged constitutional violation. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). The clause in Miami-Dade Board of County Commissioners' Resolution No. R-163-17 ("Resolution No. R-163-17") stating that correctional officials must comply with the law is no defense. Nor is the County's unsupported assertion that ICE's actions were the "sole cause" of Mr. Creedle's detention. D.E. 11 at 1. Lastly, the County's claim that Mr. Creedle must establish "deliberate indifference" is incorrect, as the County established a policy expressly instructing its correctional officers to honor ICE detainers.

Mr. Creedle alleges that the County caused his post-bond detention because it voluntarily agreed to ICE's detainer request and this action was pursuant to County policy and practice. Specifically, Mr. Creedle alleges that Mayor Gimenez issued an official, written directive to jail officials to honor all ICE detainers, D.E. 1 at 8, and the County Board of Commissioners enacted a resolution ratifying Gimenez's memorandum by mandating that the County cooperate with ICE regarding immigration detainer requests. *Id.* This resolution reversed a prior resolution that limited the honoring of detainers to only narrow circumstances, effectively halting the practice of detaining people for DHS. *Id.* Mr. Creedle further alleges that the County has "maintained a practice of holding individuals in its custody beyond the time they would otherwise be released on the sole basis that the person is the subject of an

9

immigration detainer request." *Id.* at 9.[11] These allegations, taken as true, are sufficient to establish that the County has a policy or practice of holding people beyond the end of their criminal custody and that this policy or practice caused Mr. Creedle's post-bond detention.[12]

The County argues that the Mayor's memorandum is irrelevant and the only relevant policy is that contained in the County Board's resolution, which instructs correctional officers to cooperate with ICE to the extent permissible by law. The County further argues that this clause insulates it from all liability. The County is incorrect on both counts. The Board's resolution constituted a reversal of the County's prior policy of only honoring detainers in limited circumstances and a blessing of Mayor Gimenez's directive to honor all detainers. The Mayor's directive has not been rescinded or modified and remains operational. Any doubt regarding the meaning of the resolution is settled by looking at the across-the-board practice in the County jail, which is to honor all ICE detainers. *Id.* at 4.[13]

The clause in Resolution No. R-163-17 stating that the detainer policy must comply with the law in no way insulates the County from liability or makes it facially lawful. The official position of the County—as evidenced by the County's position in this lawsuit—is that its blanket policy of honoring all detainers issued by ICE is lawful. If adding a statement that its policies are subject to the constraints of

---

[11] Mr. Creedle supports this allegation of a county practice with detailed and specific allegations regarding what happens as a matter of routine when a detainer is lodged. D.E. 1 at 4 (correctional officials mark "immigration hold" on people's jail card); *Id.* (in court, correctional officials call out "immigration hold").

[12] *See Orellana v. Nobles Cty.*, 230 F. Supp. 3d 934, 948 (D. Minn. 2017) (denying summary judgment because the court believed a "jury could determine that [the plaintiff] was detained illegally for 10 days pursuant to an official Nobles County policy that was in effect at the time"); *Galarza*, 745 F.3d at 645 (reversing the district court's judgment dismissing a U.S. citizen's § 1983 case because county "was free to disregard the ICE detainer, and it therefore cannot use as a defense that its own policy did not cause the deprivation of Galarza's constitutional rights"); *Mercado*, 229 F. Supp. 3d at 515 (declining to grant mot. to dismiss because the plaintiffs "plausibly alleged a violation of their Fourth Amendment right").

[13] To the extent that the County argues that Mr. Creedle was detained by a correctional official acting alone, the Court should disregard this suggestion as contrary to the allegations of the complaint. *See* D.E. 11 at 9 (suggesting that the only officer who can be sued is the officer who delivered the detainer to Mr. Creedle); *See also United States v. Gaubert*, 499 U.S. 315, 327 (1991) (courts must accept alleged facts as true when adjudicating a motion to dismiss).

the law exempts a local government from liability, a municipality could always avoid liability by simply including such a statement. No *Monell* lawsuit would ever succeed, no matter how patently unconstitutional a municipality's actions are. *Cf. United States v. Alabama*, 691 F. 3d 1269 (11th Cir. 2012) (striking down as preempted a statute despite a clause providing that it should be interpreted in a manner consistent with federal law). Moreover, even if Mr. Creedle's allegation of a *policy* fails, Mr. Creedle has also alleged a county *practice* of detaining people for ICE. D.E. 1 at 2. No policy statement of lawfulness overcomes his detailed allegations of an unlawful practice.

The County argues that it lacks liability because federal immigration officials were the "sole cause" of Mr. Creedle's detention. This argument fails because it assumes that the challenged action is the mistaken identification of Mr. Creedle as a noncitizen. As explained above, Mr. Creedle challenges the policy and practice of holding people on an immigration detainer independent of his U.S. citizenship. Even if ICE's actions were relevant to the causation analysis, they were plainly not the sole cause of Mr. Creedle's detention. Mr. Creedle would not have been detained if the County had refused to honor the detainer request. While it may be true that the County never intended to detain a U.S. citizen, this is irrelevant. The relevant point is that the County intentionally detains people for suspected civil immigration violations.

The County's action in holding Mr. Creedle in post-bond detention straightforwardly qualifies as a proximate cause of the injury he alleges. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Martinez v. California*, 444 U.S. 277, 285 (1980). Assessing whether a cause is "proximate" involves "consideration of the 'foreseeability or the scope of the risk created by the predicated conduct,' and require[s] the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged." *Cty. of L.A., Cal. v. Mendez*, 137 S. Ct. 1539, 1548-49 (2017) (citation omitted). Here, there is a direct and foreseeable connection between the County's detainer policy and practice and Mr. Creedle's allegations of violations of Fourth/Fourteenth Amendments and substantive due process.

While it is true that ICE started the chain of events that led to Mr. Creedle's post-bond detention, it was the County alone that voluntarily decided to hold Mr. Creedle beyond the close of his criminal custody. By establishing a policy mandating that correctional officers honor immigration detainers, the County could readily foresee that people would be held in post-bond detention.[14] The County was an affirmative and direct cause of Mr. Creedle's alleged injury—his post-bond detention. *See Orellana*, 230 F. Supp. 3d at 948; *Galarza*, 745 F.3d at 639-45; *Mercado*, 229 F. Supp. 3d at 504.[15]

The County incorrectly claims Mr. Creedle must establish "deliberate indifference" to establish that it detained him pursuant to a "policy" for a *Monell* liability. As the Eleventh Circuit has explained: "When a municipal policy itself violates federal law, or directs a municipality to do so, resolving 'issues of fault and causation is straightforward.'" *American Fed'n of Labor & Congress of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1187 (11th Cir. 2011) (citing *Bd. Of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). Only in the absence of an express policy does "determining causation [become] more difficult" and courts must consider whether the municipality engaged in deliberate indifference of the "known or obvious consequences" of its action. *Id.*; *Brown*, 520 U.S. at 407 (quoting *City of Canton, Ohio*, 489 U.S. at 388). Here, Mr. Creedle argues the County intended to detain him—and many others—for ICE.[16]

---

[14] A "policy" is a "course of action consciously chosen among various alternatives." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). The County changed course on its immigration detainer policy, reversing its 2013 resolution and mandating cooperation with ICE with respect to detainers. This voluntary reversal straightforwardly qualifies as a policy for the purpose of *Monell* liability.

[15] The causation in this case parallels that found in *Monell*. As the County acknowledges, the causation requirement was easily met in *Monell*. The causal relationship between the municipal action and the injury was apparent from the face of a written policy. D.E. 11 at 10. In *Monell*, the municipality had a policy that compelled pregnant employees to take unpaid leave. The unpaid leave caused the alleged injury. *Id.* The situation here is the same. The plain language of the Mayor's written directive and the Board's resolution compels the post-bond detention of those on immigration detainers, like Mr. Creedle.

[16] Even if deliberate indifference were the correct standard in this case, Mr. Creedle has sufficiently alleged that the County was deliberately indifferent to the fact that its correctional officers would honor all ICE detainers because of the Mayor's directive and the Board's resolution, as this was a "known" and "obvious consequence" of its actions. *Brown*, 520 U.S. at 407; *see also Mercado*, 229 F. Supp. 3d at 520-21.

**III.     The fellow officer rule has no relevance.**

Contrary to the County's assertion, the fellow officer/collective knowledge rule is not relevant to this case. D.E. 11 at 8 ("Miami-Dade is entitled to rely on ICE's representations as to probable cause"). The fellow officer rule permits arresting officers engaged in a "common investigation" to rely upon the information possessed by members in the group to establish probable cause for a warrantless arrest, as long as the officers have engaged in more than "minimal communication." *See United States v. Ventresca*, 380 U.S. 102, 111 (1965) (rule applies in context of arresting officers engaged in a "common investigation"); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (a "reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation"). Courts have held that the fellow officer rule does not apply when local jail officials detain people based on a probable cause finding of a civil immigration violation made by federal immigration officers. *See, e.g., Ochoa*, 2017 WL 3476777 at *13-14; *Santoyo v. United States*, No. 5:16-CV-855-OLG, 2017 WL 2896021, at *6 (W.D. Tex. June, 5 2017).

The fellow officer rule does not apply in Mr. Creedle's case for several reasons. There was neither a common investigation nor the communication needed to trigger the rule. The County detained Mr. Creedle solely based on an immigration enforcement officer's request. D.E. 1 at 11. There was no joint investigation, and the immigration enforcement officer's only communication with the jail officials was the lodging of the detainer request. *See United States v. Webster*, 750 F.2d 307, 323-24 (5th Cir. 1984) (fellow officer rule does not apply because insufficient information was communicated); *Ochoa*, 2017 WL 3476777 at *14 (analyzing fellow officer rule as not applying because there was insufficient communication). Moreover, Mr. Creedle had informed the County that he was a U.S. citizen— information regarding the lack of probable cause that the County was not permitted to ignore. *See Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003) (fellow officer rule does not permit an arresting officer to "disregard facts tending to dissipate probable cause"); *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)

(placing burden on arresting officers to have "particularized" probable cause); *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) (an arrest "cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest").

As noted above, County correctional officers lack state authority to make a warrantless arrest, and federal law does not authorize County officers to make civil immigration arrests. Without both state and federal authority to make a warrantless arrest, correctional officers cannot be part of a "common investigation" that would serve as a predicate for relying on another officer's information. *See Pierre*, 537 F. App'x. at 824-25 (fellow officer rule does not apply when officer in question lacked warrantless arrest authority). Even if correctional officers had authority to make a warrantless arrest, they could not rely on information from an ICE officer to make a probable cause determination regarding a civil immigration violation. As explained above, county officials lack federal authority to enforce civil immigration law because there is no 287(g) agreement deputizing municipal officers as ICE agents. *See Ochoa*, 2017 WL 3476777 at *14 (expressing skepticism that the fellow officer rule permits "mixing" probable cause determinations between federal immigration and local officers).

The County cites to *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013), as support for its position. This case involved two police officers with warrantless arrest authority involved in a common investigation. *Id.* One officer was called to the scene to assist the arresting officer, who made an arrest that was later ruled to be unlawful. *Id.* The Eleventh Circuit held that while a non-arresting officer can normally be held liable, the facts did not support liability because the non-arresting officer arrived late to the scene and did not have the information needed to be put on notice that the arrest was unlawful. *Id.*

*Wilkerson* does not control Mr. Creedle's case because it involved a common investigation in which the officers were communicating. *Wilkerson* also involved the potential liability of a non-arresting officer. *Id.* at 979. Here, County jail officials were the arresting officers because they held Mr. Creedle beyond the close of his criminal case. Moreover, the non-arresting officer in *Wilkerson* was unaware of

the key facts underlying the unlawful arrest. *Id* at 980. In contrast, Miami-Dade correctional officers were fully aware that they were holding Mr. Creedle on an ICE detainer.

*United States v. Hensley*, 469 U.S. 221, 231 (1985), does not insulate the County from liability. *Hensley* permitted one arresting officer to rely on a "wanted" flyer from another jurisdiction. *Id.* at 232. There was significant communication between the officers involved in the investigation and the jurisdiction that issued the flyer. *Id.* at 223-224. The Supreme Court held that the arresting officer did not violate the Fourth Amendment as long as the flyer had been issued based on specific and articulable facts of a crime having been committed. *Id.* at 233-34. The Court recognized that the arrest would have violated the Fourth Amendment if no probable cause had existed for the issuance of the wanted flyer. *Id.* at 230-31 (citing *Whiteley*, 401 U.S. at 568). *Hensley* supports Mr. Creedle's position because it makes clear that a Fourth Amendment violation occurs when an arresting officer makes a stop or arrest based on information from another law enforcement entity that is not based on specific, articulable facts. *Id.*

The County's cite to *Dry v. United States*, 235 F.3d 1249, 1259 (10th Cir. 2000), is equally unavailing. In *Dry*, the court rejected the plaintiff's claim that the jailer was obligated to question the arresting police officers regarding the basis of their probable cause finding and to conduct an independent analysis of the legal and jurisdictional basis of the arrest. *Dry*, 235 F.3d at 1259. The court held that "absent any objectively apparent 'lack of a basis for a detention which should arouse suspicion, a jailer cannot be expected to assume the mantle of a magistrate to determine the probable cause for an arrest.'" *Id.* (citing Summ. J. Order at 7, Aplt. Br. At Tab 10). The holding in *Dry* also supports Mr. Creedle's position. The detainer request contained an "objectively apparent 'lack of a basis for a detention'" because it contained no specific articulable facts, and County correctional officers lacked authority under state or federal law to detain for civil immigration violations. *Id.* Moreover, Mr. Creedle's statement to his jailers that he was a U.S. citizen should also have alerted the County to the

15

fact that no probable cause existed for his detention.[17]

### IV. Declaratory judgment is appropriate in this case.

The County incorrectly asserts that declaratory relief pursuant to 28 U.S.C. § 2201 is inappropriate in this case because there is no "actual" or "continuing controversy" that would be remedied by a declaratory judgment in Mr. Creedle's favor. To establish that there is an actual and continuing controversy, a "plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred" and "the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985). The facts alleged by Mr. Creedle establish that an actual and continuing controversy between him and the County exists. The County's attempt to convince the Court otherwise is based on factors that are factually and legally irrelevant.

First, the County suggests that Mayor Gimenez's directive on immigration detainers is no longer in force, presumably based on the County Board's subsequent resolution regarding ICE's detainer requests. *See* D.E. 11 at 6. However, as discussed above, the County Board voted to *affirm* the Mayor's immigration detainer policy.[18] Second, the County references a new ICE policy requiring immigration detainers submitted to local law enforcement to be accompanied by an administrative warrant issued by an ICE enforcement official. It is hard to see how a change in ICE's detainer policy is relevant to Mr. Creedle's challenge to the County's detainer policy. The administrative warrants issued by ICE are directed solely to an "immigration officer" and on their face do not purport to provide any additional

---

[17] The County cites to *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir. 1976), for the idea that the county is not liable for errors outside their "realm of responsibility." But the error challenged by Mr. Creedle is not the lodging of a detainer against a U.S. citizen but the County's voluntary decision to seize him. The County's reliance on *People v. Xirum*, 993 N.Y.S. 2d 627 (N.Y. Sup. Ct. 2014), is also not directly relevant, as the underlying facts involved a noncitizen still in criminal detention who had a final order of removal.

[18] *See also Miami-Dade Commissioners Vote in Favor of Mayor's Policy on Immigration Issue*, NBC Miami, Feb. 17, 2017, http://www.nbcmiami.com/news/local/Miami-Dade-Commission-Meeting-Friday-to-Deal-With-Mayors-Reversal-on-Immigration-Issue-414049616.html; *Sanctuary Shutdown in Miami-Dade*, CBS Miami, Feb. 17, 2017, http://miami.cbslocal.com/2017/02/17/sanctuary-showdown-in-miami-dade/.

authority for or command to local law enforcement officers to take any action with regard to an alleged noncitizen. *See* Warrant for Arrest of Alien ("Ex. 2"); *Ochoa,* 2017 WL 3476777 at *12 ("Nothing in the [ICE] administrative warrant indicates that it is directed at [county] officials or anyone other than authorized immigration officers."). ICE's administrative warrants in no way alter the County's policy of complying with immigration detainer requests, which is the only policy being challenged in this lawsuit. Moreover, the County's allusion to ICE's current issuance of administrative warrants is based on facts outside the "four corners" of Mr. Creedle's Complaint, which the Court cannot consider when ruling on a motion to dismiss. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).

Next, the County argues that Mr. Creedle has no standing to pursue declaratory relief because he is no longer in the County's custody and the detainer request issued against him has been withdrawn. Although the events that gave rise to this lawsuit have past, this is a classic case of unlawful government action that is "capable of repetition, yet evading review." The Supreme Court has recognized two elements that a plaintiff must satisfy in a non-class action in order to establish standing based on this doctrine: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1324 n.6 (11th Cir. 2001) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Mr. Creedle satisfies both prongs. Unlawful detentions pursuant to an ICE detainer request usually do not exceed 48 hours, which is obviously not enough time to fully litigate a case. And it is possible that Mr. Creedle could again be illegally detained pursuant to an ICE detainer request if he is ever again in the County's custody. The County's policy requires its officers to blindly comply with any detainer request issued by ICE. If ICE wrongfully issues another request to detain Mr. Creedle, the County would hold him pursuant to ICE's request. *See Massachusetts v. EPA*, 549 U.S. 497, 525 n.23 (2007) ("[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical")

(quoting *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)).[19]

A district court, in another non-class action involving a challenge to detention pursuant to an ICE detainer request, examined this exact same issue and correctly found that the plaintiff had standing to seek a declaratory judgment that his detention was unconstitutional because "ICE issues hundreds of thousands of detainers each year but the prolonged detention is never long enough to get legal review while it is actually happening." *Uroza v. Salt Lake Cty.*, No. 2:11CV713DAK, 2014 WL 4457300, at *7 (D. Utah Sept. 10, 2014). The court also found that the plaintiff "and others like him face a real risk of being subject to the policy again in the future." *Id.* The court noted that a declaratory judgment was necessary to resolve the case as "damages alone would not resolve the controversy." *Id.* at *8.

### V.       DHS and an ICE officer are not required parties under Fed. R. Civ. P. 19.

The County claims that DHS and the ICE officer who issued the immigration detainer in this case are required parties under Fed. R. Civ. P. 19 and *Florida Wildlife Federation Inc. v. United States Army Corps of Engineers*, 859 F.3d 1306, 1316 (11th Cir. 2017).[20] However, the legal authority for the underlying cooperative arrangement between local and federal entities (an intergovernmental project specifically authorized by Congress) was never at issue in *Fla. Wildlife Fed'n*. In contrast, Mr. Creedle argues the County lacked both federal and state law authority to comply with the immigration detainer issued by DHS. *Fla. Wildlife Fed'n* involved a formal framework of cooperation mandated by Congress, with shared intergovernmental rights and duties, such that the local entity played an "integral" role in the

---

[19] The County claims that declaratory relief is inappropriate because "there are no allegations that he fears" being subject to another ICE detainer and that such allegations would be "entirely conjectural." D.E. 11 at 7. But it is not necessary for a plaintiff to specifically allege fear of future injury in the Complaint. He must only "allege facts from which the continuation of the dispute may be reasonably inferred." *See Emory*, 756 F.2d at 1552. *See also 907 Whitehead St., Inc. v. Vilsack*, No. 09-10050-CIV-MARTINEZ-BROWN, 2010 WL 11505219, at *3 (S.D. Fla. Aug. 25, 2010) (rejecting defendants' argument that plaintiff had to allege continuing and future injury in its complaint, "[l]iberally construing the complaint in favor of the Plaintiff," and finding that plaintiff's allegations provided "a basis to infer" continuing and future injury.).

[20] The County also points to Fed. R. Civ. P. 5.1. This statute is not applicable because this case does not involve a challenge to the constitutionality of any federal or state statute.

federal agency's management of shared local and national resources. 859 F.3d at 1317. Here, by contrast, the County's compliance with detainers was not based on any formal agreement between the County and DHS. *See* 8 U.S.C. §§ 1103(a)(11)(B), 1103(c), and 1357(g).[21]

The County claims that it will be subject to "inconsistent obligations," citing Fed. R. Civ. P. 19(a)(1)(B)(ii), unless DHS is joined. But the County owes no legal duty to the United States to comply with detainer requests. Conversely, the United States has no legal rights at stake in the subject-matter of this litigation that are in danger of being impaired or impeded. The County's independent decision to honor detainer requests does not afford the United States any legally-protected interest in the outcome of this suit, and this Court's decision would not interfere with any legal obligation of the United States. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1040 (11th Cir. 2014); *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 789 F. Supp. 1201 (D.N.H. 1992); *Challenge Homes Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669-670 (11th Cir. 1982). As other courts have found, "there is no reason that complete relief cannot be accorded among those already parties" in an action against a local government for complying with an immigration detainer. *See, e.g., Mercado,* 229 F. Supp. 3d at 523.

### VI. Mayor Gimenez is properly named as a Defendant.

Mr. Creedle has properly alleged claims as to Mayor Gimenez in his official capacity. Although an official capacity § 1983 claim is the "functional[ ] equivalent" of a claim against the governmental entity, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991), dismissal of an agency head is not mandatory absent a concern of jury confusion. *See C.P. by & through Perez v. Collier Cty.*, 145 F. Supp. 3d 1085, 1089-91 (M.D. Fla. 2015) (dismissing official capacity claims against two deputy sheriffs, but not

---

[21] The County incorrectly invokes 8 U.S.C. §§ 1357(g)(3), (8), claiming that, in complying with DHS' federal immigration detainer, the County was subject to the "direction and supervision" of DHS and "considered to be acting under color of Federal authority." These claims are incorrect because 8 U.S.C. §§ 1357(g)(1)-(8) governs the performance of immigration officer functions by state and local officers pursuant to a written agreement. *See* 8 U.S.C. § 1357(g)(1); *see also Santos*, 725 F.3d at 463. Allowing the County to claim the benefits of 8 U.S.C. §§ 1357(g)(3), (8) without the requirement of a written agreement would render the provisions of 8 U.S.C. §§ 1357(g)(1)-(8) superfluous or insignificant.

the sheriff and the county). The County does not suggest any potential for jury confusion here, and consequently Mayor Gimenez should remain a defendant.

CERTIFICATE OF SERVICE

I hereby certify that, on October 2, 2017, I electronically served a true and correct copy of the foregoing on counsel for Defendants via transmission of a Notice of Electronic Filing generated by the CM/ECF system of the U.S. District Court of the Southern District of Florida.

Respectfully submitted,*

| | |
|---|---|
| By: /s/ Rebecca Sharpless<br>REBECCA SHARPLESS<br>Florida Bar No. 0131024<br>IMMIGRATION CLINIC<br>UNIVERSITY OF MIAMI SCHOOL OF LAW<br>1311 Miller Drive Suite E-273<br>Coral Gables, Florida 33146<br>Tel: (305) 284-3576, direct<br>Tel: (305) 284-6092, clinic<br>rsharpless@law.miami.edu<br><br>IRA J. KURZBAN<br>Florida Bar No. 225517<br>EDWARD F. RAMOS<br>Florida Bar No. 98747<br>IAN K. SHAW<br>Florida Bar No. 115167<br>KURZBAN KURZBAN WEINGER<br>TETZELI & PRATT, P.A.<br>2650 SW 27th Avenue<br>Second Floor<br>Miami, FL 33133<br>Tel: 305-444-0060<br>Fax: 305-444-3503 | AMIEN KACOU<br>Florida Bar No. 44302<br>ACLU FOUNDATION OF FLORIDA, INC.<br>4023 N. Armenia Avenue, Suite 450<br>Tampa, FL 33607<br>Tel: (813) 288-8390<br><br>NANCY ABUDU<br>Fla. Bar No. 111881<br>ACLU FOUNDATION OF FLORIDA, INC.<br>4343 W. Flagler St., Suite 400<br>Miami, FL 33134<br>Tel: 786-363-2700<br>Fax: 786-363-1448 |

* Law students Candelario Saldana and Pablo Pazos of the University of Miami School of Law contributed to the drafting of this pleading.