UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

GARLAND CREEDLE,
   Plaintiff,         v.

CARLOS A. GIMENEZ, in his official
capacity as Mayor of Miami-Dade County,      Case No.: 17-22477-Civ-Williams
Florida; and MIAMI-DADE COUNTY,
Florida,
   Defendants.

_____/

**PLAINTIFF'S RESPONSE TO THE
STATEMENT OF INTEREST OF THE U.S. GOVERNMENT**

Plaintiff Garland Creedle responds to the U.S. government's statement of interest, pursuant to the Court's order of November 7, 2017. D.E. 30. The statement defends the County's seizure of a U.S. citizen for suspected immigration violations on the false premise that the United States issued a warrant for Mr. Creedle's arrest. In fact, no such warrant was ever issued. *See* D.E. 1, ¶54. As a consequence, not even *federal* officers could have lawfully arrested Mr. Creedle, *see* D.E. 19 at 5, making the *County's* decision to arrest and detain him especially unreasonable.

Even if federal officials had issued an administrative warrant as the United States erroneously assumed, the warrant would not have authorized County jail officers to arrest Mr. Creedle. Administrative warrants are addressed only to *federal* authorities specially trained in immigration enforcement. The County has no authority to make civil immigration arrests, and the federal government's issuance of an administrative warrant does not change that fact.

I.      **The County Has No Authority to Make Civil Immigration Arrests Without a Section 1357(g) Agreement.**

The United States argues that the County's arrest of Mr. Creedle was authorized under federal law because it qualified as authorized "cooperation." D.E. 26 at 7. This is incorrect. While the immigration statute does authorize cooperation between federal and local officials in the enforcement of immigration

law, this cooperation does not include the authority to arrest absent a written agreement under 8 U.S.C. §1357(g). As explained in prior briefing to the Court, and as acknowledged by the United States, federal law provides a mechanism through section 1357(g) agreements for state and local officers to be deputized "to perform specified immigration enforcement functions relating to investigating, apprehending, and detaining aliens." D.E. 19 at 3-5; D.E. 26 at 3 (citing 8 U.S.C. §1357(g)(1)-(9)). But the United States argues that *even absent* a section 1357(g) agreement, County officers can "apprehend[]" and "detain[]" people for suspected civil immigration violations. D.E. at 3-4. In United States' view, the County does not need a section 1357(g) agreement for its officers to make an immigration arrest, as long as an immigration officer requested the arrest. But the United States does not, and cannot, point to any statutory provision that, absent a 1357(g) agreement, authorizes non-federal officials to re-arrest someone like Mr. Creedle, whose criminal custody has come to an end.

In *Arizona v. United States*, the Supreme Court examined the "system Congress created" to enforce civil immigration law and emphasized the limited nature of the exceptions to the rule that federal officers enforce civil immigration law. 567 U.S. 387, 408 (2012). The Immigration and Nationality Act authorizes federal officials to make a civil immigration arrest in the interior either (1) pursuant to an immigration arrest warrant; or (2) when the person is "likely to escape before a warrant can be obtained" and there is "reason to believe" the person has violated federal immigration laws. *Id.* at 407-08 (describing the "federal statutory structure" for "when it is appropriate to arrest an alien during the removal process"); 8 U.S.C. §§ 1226, 1231(a)(2), 1357(a)(2). Civil immigration arrests—including the execution of an administrative warrant—must be executed by trained immigration officers. *Arizona*, 567 U.S. at 407-08; *see also* 8 C.F.R. § 287.5(e)(3) (requiring training to execute warrants); Form I-200, (immigration arrest warrant directed to "immigration

officer[s] authorized pursuant to [INA and regulations] to serve warrants");[1] Form I-205 (immigration warrant with similar direction).[2]

The statute authorizes *non*-federal officials to make civil immigration arrests and detain non-citizens only in narrowly defined circumstances. *Arizona,* 567 U.S. at 408-09. Of the three "limited circumstances in which local officers may perform the [civil arrest] functions of an immigration officer," only an agreement under 8 U.S.C. § 1357(g) could provide the civil arrest authority that the County exercised against Mr. Creedle. *Id.* Section 1357(g) permits cooperative agreements whereby non-federal officials "determined by the [DHS Secretary] to be qualified" are authorized "to perform [the] function of an immigration officer" as to the "investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1); 8 C.F.R. §§ 236.1(b), 239.1, 241.2, 287.3, 287.5, 287.8 (enumerating in detail the enforcement functions of an immigration officer). The statute requires these non-federal officials to "receive[] adequate training regarding the enforcement of relevant Federal immigration laws" and be "subject to the direction and supervision of the [DHS Secretary]." 8 U.S.C. §1357(g)(2)-(3); *Arizona*, 567 U.S. at 409; *see also United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (interpreting 1357(g) as "stating that local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions that are not applicable in the present case"). Absent such an agreement, federal law does "not embrace detention of a person based solely on [ . . . ] an ICE detainer. Such detention exceeds the 'limited circumstances' in which state officers may enforce federal immigration law and thus violates 'the system Congress created.'" *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, --- F. Supp. 3d ----, 2017 WL 5634965, at *10 (S.D. Ind. Nov. 7, 2017).

---

[1] *Available at* Immigration and Customs Enforcement, http://bit.ly/2zxOVRy (Sept. 2016).
[2] *Available at* Immigration and Customs Enforcement, http://bit.ly/2hZ35TY.

The United States argues that the last subsection of 1357(g), section 1357(g)(10), authorized the County to detain Mr. Creedle. D.E. at 7.[3] This provision states that no written agreement is required "for any officer or employee of a State or political subdivision of a State to communicate with the Attorney General regarding the immigration status of any individual . . . or otherwise to *cooperate* with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(1) (emphasis added). As recognized by the Supreme Court in *Arizona*, however, "cooperation" in this context "include[s] situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities," not the outright arrest and detention of persons believed to be civil immigration violators. *See Arizona*, 567 U.S. at 410; *see also id.* (characterizing the response to detainers *as providing notification of release rather than detention* when listing it as an example of non-federal "cooperat[ion] with the Attorney General" permitted by the 8 U.S.C. § 1357(g)(10)(B)). Contrary to the United States' contention, the Court in *Arizona* <u>never</u> *stated* that "arrest[ing] an alien for being removable" was an example of "cooperation." D.E. 26 at 4. Indeed, section 1357(g) agreements would be entirely superfluous if "cooperation" extended to include the authority to arrest.

Subsection (g)(10) did not expand any state or local power over immigration enforcement but only preserved the existing limited role of states and localities as collaborators in immigration enforcement. Congress enacted section 1357(g) in 1996 as part of the Illegal Immigration Reform and Immigrant

---

[3] The United States cites to *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 467 (4th Cir. 2013), for the proposition that "detention by state officer [is] lawful when 'at ICE's express direction.'" D.E. 26 at 8. The court in this case, however, came to the opposite conclusion, namely that the police officer *had* violated Santos' Fourth Amendment rights when he seized her based solely on a civil immigration warrant. *Id.* at 465. The court, however, recognized that such a stop would have been lawful if it had occurred at ICE's express direction *and* there had been an "independent basis" for the stop. *Id.* at 467. *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014), is also inapposite, as the court held in that case that the police officer had a valid basis for a traffic stop and did not prolong detention of Ovando-Garzo while waiting for immigration authorities to arrive.

Responsibility Act of 1996. *See* Section 133, Division C, Title I of the Omnibus Consolidated Appropriations Act of 1997, Pub.L. 104–208, 110 Stat. 3001 (Sept. 30, 1996). The first subsections, (g)(1) through (9), expanded state and local authority to enforce civil immigration law by providing *inter alia* for deputization of non-federal officers. 8 U.S.C. § 1357(g)(1); *see Arizona,* 567 U.S. at 409 (comparing § 1357(g)(2) with 8 C.F.R. § 287.5(e)(3)). Subsection (g)(10), however, did not expand non-federal authority but was enacted as a proviso to the grants of authority under subsections (g)(1) through (9). A proviso is "a clause engrafted on a preceding enactment in order to restrain or modify the enacting clause or to except something from the operation of the statute which otherwise would have been within it." 82 C.J.S. Statutes § 502. A proviso acts "to restrain or modify the enacting clause, and not to enlarge it, or to confer a power." *Id.* § 504.  The proviso of subsection (g)(10) clarifies that a written agreement is not necessary for non-federal officials to participate in immigration enforcement in ways that had previously been permitted. 8 U.S.C. § 1357(g)(1).

The United States is wrong to assert that section 1357(g) is not a proviso but an affirmative grant of authority to non-federal officials to make civil immigration arrests. Section 1357(g)(10)'s role as a proviso is made clear by its opening language: "Nothing in this subsection shall be construed . . . ." *See, e.g., Edward J. DeBartolo Corp. v. NLRB,* 463 U.S. 147, 149 n.2 (1983) (involving proviso stating "nothing contained in such paragraph shall be construed …."); *Postal Tel.-Cable Co. v. Tonopah & Tidewater R. Co.,* 248 U.S. 471, 474 (1919) (involving proviso stating "that nothing in this Act shall be construed…."); *United States v. Forty Barrels & Twenty Kegs of Coca Cola,* 241 U.S. 265, 275 n.2 (1916) (involving proviso stating "nothing in this act shall be construed…."). Indeed, in the limited circumstances Congress delegates civil immigration arrest authority to non-federal officials it does so clearly, expressly using the word "authorize." *See* 8 U.S.C. §§ 1357(g)(5) (referring to a 1357(g) deputized state or local officer as someone "*authorized* to perform a function under this subsection" (emphasis added); 8 U.S.C. § 1103(a)(10) (in the case of "mass influx of aliens" the Attorney General "may *authorize* any State or local law enforcement

officer … to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the [immigration] Service") (emphasis added); 8 U.S.C. § 1252c ("State and local law enforcement officials are *authorized* to arrest and detain an individual who" has a felony conviction and who is unlawfully present after a prior deportation) (emphasis added); *see also Lunn v. Commonwealth*, 78 N.E.3d 1143, 1159 (Mass. 2017) (observing that "[i]n those limited instances where the [INA] affirmatively grants authority to [non-federal] officers to arrest, it does so in more explicit terms than those in [8 U.S.C.] § 1357(g)(10)"). As the Supreme Court has repeatedly recognized, "when Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989) (citing *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)) (finding that "when Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute"); *see also United States v. Bass*, 404 U.S. 336 (1971) (explaining that "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision").

The United States' own written guidance on section 1357(g)(10)(B), submitted in *Arizona,* further demonstrates that non-federal officer arrests based on detainers or administrative warrants do not qualify as mere "cooperation . . . in the identification, apprehension, detention, or removal of aliens" under Section 287(g)(10)(B). *See* 567 U.S. at 410 (citing DHS, "Guidance on State and Local Governments' Assistance in Immigration Enforcement and related Matters," at 13-15). The memorandum does not list arresting suspected noncitizens on detainers as an example of cooperation. To the contrary, the only reference to an arrest by local authorities as an example of cooperation is "[w]here *independent* state or local law grounds provide a basis for doing so." DHS, "Guidance on State and Local Governments' Assistance in Immigration Enforcement and

related Matters," at 13, https://www.dhs.gov/sites/default/files/publications/guidance-state-local-assistance-immigration-enforcement.pdf (last visited Nov. 27, 2017) (emphasis added). If this Court were to adopt the expansive interpretation of section 1357 (g)(10)(B) now urged by the United States, it would render section 1357(g)'s requirement of an agreement and training to exercise the "function of an immigration officer" meaningless. *Cf. U.S. v. Locke*, 529 U.S. 89, 106–107 (2000) (declining to "give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law," or would upset "the established federal-state balance").

## II.        County Arrests on ICE Detainers Violate Florida Law.

The United States argues that arrests on ICE detainers are consistent with Florida law because states have the "inherent authority" to make such arrests and that Florida statutes authorize County jailers to arrest people for a civil immigration violation on ICE's request. D.E. 26 at 10-13. The United States is wrong on both counts.

### A.   The County Lacks Inherent Authority to Enforce Civil Immigration Law.

Although the United States claims that States have "inherent" authority to make civil immigration arrests, the Supreme Court has made clear that "[t]he authority to control immigration – to admit or exclude aliens – is vested solely in the *Federal* government." *Arizona*, 567 U.S. at 409-10 (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)) (emphasis added). States had no historic police power to make civil immigration arrests,[4] and as *Arizona* made plain, the scope of non-federal officers' authority to enforce civil immigration law depends on federal law. There, the Court recognized that federal law

---

[4] *See* Peter Markowitz, *Straddling the Civil-Criminal Divide: A Bifurcated Approach to Understanding the Nature of Immigration Removal Proceedings*, 43 Harv. C.R.-C.L. L. Rev. 289, 311 n. 119, 320-327 (2008) (distinguishing between the historic power to expel people from a territory for crimes and the administrative power to exclude aliens at the border: "a review of English history demonstrates that the power to expel was exercised as a *criminal* punishment" and "[i]n sharp contrast to the well-established civil administrative power to exclude undesirable immigrants, American colonial history is devoid of any civil laws used to expel noncitizens after admission") (emphasis added).

"specifies limited circumstances in which state officers may perform the functions of an immigration officer," rejecting the notion that state officers had inherent authority to enforce civil immigration laws beyond the "system Congress created." *Id.* at 408-410.[5] More generally, the Supreme Court has carefully limited when states can make warrantless arrests, confining such authority to some, but not all, *criminal* offenses. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 332, 341, 346 (2001). This careful, qualified extension of the general warrantless arrest power is inconsistent with the United States' expansive view that such power, "absent explicit legislative action" to the contrary, extends to state arrests for civil immigration offenses—offenses that do not even exist at state law. D.E. 26 at 10.

Florida case law also contradicts the idea that common law, nonstatutory arrest authority extends to noncriminal violations of law, like civil immigration offenses. *See L.B.B. v. State*, 998 So. 2d 1217, 1218 (Fla. 2d DCA 2009) (holding that a bicycle infraction is noncriminal in nature and a person cannot be arrested for such infraction, even though no statute prohibited such arrests); *Thomas v. State*, 614 So. 2d 468, 470-72 (Fla. 1993) (holding that a full custodial arrest for violation of a municipal ordinance which was neither a crime nor a "noncriminal violation" under Florida statutes was unconstitutional under both the Fourth Amendment and Article I, section 12 of the Florida Constitution, even though no statute prohibited such arrests).

Absent any reference to the specific public purpose (or to any common law precedent or other authority) for state police powers to make civil immigration arrests, it is also impossible to establish that

---

[5] Indeed, the United States *advocated* that position in the case, stating that civil immigration enforcement actions "do not fall within the state's traditional police power." *See* Complaint, *United States v. Arizona*, No. 2:10-cv-01413 13 (D. Ariz. *Filed* July 6, 2010), available at 2010 WL 2653363; *see also* Brief for Respondent at 27 (No. 11-182), available at 2012 WL 939048 ("the fact that the State does not and cannot register aliens itself simply underscores the State's lack of any independent interest in punishing aliens who fail to register"). The United States' position here is not only a complete reversal of its position in *Arizona*, but it runs contrary to Defendant Mayor Gimenez's acknowledgment that that "Miami-Dade County police officers have not, are not, will not be immigration officers[.]" *See* Douglas Hanks, *Miami-Dade Commissioner Backs Off Proposal Barring Police from Enforcing Immigration Laws*, Miami Herald, March 14, 2017, http://hrld.us/2lYkWLw.

the State granted or intended to delegate any such power to the County. Even if the State of Florida has inherent authority, the County does not. *See XO Missouri, Inc. v. City of Maryland Heights*, 362 F.3d 1023, 1027 (8th Cir. 2004) ("[i]nherent police power belongs to the states. Political subdivisions of a state have no inherent claim to such power"); *see also Law v. Phillips*, 68 S.E.2d 452, 462 (1952) ("when there is any fair, substantial, or reasonable doubt whether a particular power is possessed by a municipal corporation existence of the power in question must be denied").

The caselaw cited by the United States is unavailing. The United States cites *United States v. Bowdach*, 561 F.2d 1160 (5th Cir. 1977), for the proposition that "Florida state officers may make arrests based on federal statutes or arrest warrants notwithstanding absence of state statute explicitly and specifically so permitting." D.E. 26 at 10. However, *Bowdach* involved a felony arrest where the arresting officers had knowledge of a federal criminal arrest warrant being issued against the suspect, and the Court found that such arrests were lawful *specifically* because they were explicitly authorized by Florida statutes. *Bowdach*, 561 F.2d at 1168; Fla. Stat. § 901.15. By contrast, Mr. Creedle's case involves a civil offense, no federal warrant, and no explicit statutory authorization.

The United States likewise relies on the Tenth Circuit's ruling in *United States v. Santana-Garcia*, 264 F.3d 1188 (10th Cir. 2001), which rejected the requirement that "before a state law enforcement officer may arrest a suspect for violating federal immigration law, state law must affirmatively authorize the officer to do so."[6] D.E. at 26. *Santana-Garcia*, however, was premised on an outdated, expansive view of state immigration authority that is inconsistent with the more recent *Arizona* decision. *See, e.g., Santana-Garcia*,

---

[6] Contrary to the United States' description of an "overwhelming consensus" on this issue, D.E. 26 at 10, the *Santana-Garcia* court acknowledged that other circuits had already ruled differently. 264 F.3d at 1194 (citing *Gonzales v. City of Peoria*, 722 F.2d 468, 475 (9th Cir.1983) as "suggesting state law must affirmatively grant local authorities the power to arrest for a federal immigration law violation"). The court in *City of Peoria* also specifically distinguished the "broad scheme" of federal *civil* immigration regulation, as field preempted, from the "narrow and distinct element" of federal *criminal* immigration regulation, to which state powers might apply. 722 F.2d at 475.

264 F.3d at 1193 (citing *United States v. Vasquez–Alvarez*, 176 F.3d 1294, 1296, 1299 n. 4, 1300 (10th Cir. 1999)) ("federal law as currently written does nothing 'to displace ... state or local authority to arrest individuals violating federal immigration laws'" but instead "'evinces a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws'"); *but see United States v. Arizona*, 641 F.3d at 365, *affirmed in part, reversed in part and remanded by Arizona*, 567 U.S. 387 (specifically rejecting *Vasquez–Alvarez*'s reasoning).

The *Santana-Garcia* court's decision was also partly based on its broad construction of a state statute providing affirmative arrest authority for "any public offense" to include federal immigration offenses. 264 F.3d at 1192-1194; Utah Code Ann. § 77-7-2. Here, by contrast, there exists no similarly broad state statutory arrest authority, which might extend to immigration offenses. Instead, Fla. Stat. § 901.15 lays out the limited circumstances under which a Florida officer may make an arrest without a Florida warrant, and none of those circumstances includes arrests based on ICE detainers or similar requests. The United States cites Fla. Stat. § 901.15(4), which provides for warrantless arrests when "[a] warrant for the arrest has been issued and is held by another peace officer for execution," as a relevant example of statutory authority to make civil immigration arrests. However, that statute does not apply, since no federal warrant was issued in Mr. Creedle's case. Moreover, although that statute does not say explicitly that the warrant must be for a crime, principles of statutory construction mandate this interpretation. The clause "without a warrant" in the preamble of Fla. Stat. § 901.15 and the "warrant" referenced later in subsection (4) each refers to a criminal arrest warrant—the only kind of warrant discussed throughout Ch. 901 and described in Fla. Stat. § 901.02(1).[7]

---

[7] The Eleventh Circuit's holding in *United States v. Phillips* that a writ of bodily attachment for unpaid child support issued under another Florida statute, Fla. Fam. L.R.P. 12.615, was a "warrant" within the meaning of the Fourth Amendment did not affect the interpretation of Fla. Stat. Ch. 901. 834 F.3d 1176 (11th Cir. 2016).

### B.  The County Lacked Authority Under Fla. Stat. § 901.18.

The United States claims in the alternative that the County had the authority to arrest Mr. Creedle on an ICE detainer under Fla. Stat. § 901.18, which provides that "[a] peace officer making a lawful arrest may command the aid of persons she or he deems necessary to make the arrest," and that "[a] person commanded to aid a peace officer shall have the same authority to arrest as that peace officer." However, this statute is inapplicable—not because ICE officers are not "peace officers," but because ICE officers who issue ICE detainers do not thereby initiate or become involved in the process of "making a lawful arrest" under the statute. *See* D.E. 19 at 8. Florida courts have consistently applied this statutory provision to cases where the peace officer with the initial arrest authority was "on the scene" or "in close proximity." *State v. Eldridge*, 565 So.2d 787, 788 (Fla. 2d DCA 1990); *Goodman v. State*, 399 So. 2d 1120, 1121 (Fla. Dist. Ct. App. 1990); *see Riehle v. State, Dept. of Highway Safety and Motor Vehicles, Bureau of Driver Improvement*, 684 So. 2d 823, 825 (Fla. 2d DCA 1996); *Huebner v. State*, 731 So.2d 40, 44 (Fla. 4th DCA 1996).[8] Here, only the County officials who arrested Mr. Creedle were present at the scene of his arrest. Nor could ICE officials claim that they had made a constructive arrest of Mr. Creedle by merely issuing a detainer. *See Orozco v. INS*, 911 F.2d 539, 541 (11th Cir. 1990) (for purposes of the custody requirement for habeas corpus proceedings, the filing of a federal detainer does not cause a person to come within the legal custody of the United States).

Mr. Creedle's arrest was inconsistent with Florida statutes for the further reason that Fla. Stat. § 901.15(10) limits Florida law enforcement officers' warrantless arrest authority for federal misdemeanors

---

[8] Fla. Stat. § 901.18, also known as the "officer assistance statute," should not be confused with the fellow officer rule, although it often is. *See* Judge Robert W. Lee, *The Fellow Officer Rule and the Officer Assistance Statute in Florida: Separate Assessments of Probable Cause*, 73 Fla. B.J. 55 (1999) (statute permits an officer who is in the process of making a lawful arrest to summon any other person *to the scene*) (emphasis added).

to those evidenced by a "signed affidavit."[9] This limitation would be rendered meaningless if the State intended its officers to retain broad police powers to make arrests in the name of "cooperation" with ICE detainers (which do not require a signed affidavit) for civil offenses that are less serious than even federal misdemeanors.[10] Hence, no Florida statute either specifically or broadly authorized the County's arrest of Mr. Creedle on a civil immigration violation.

### III.    Whether An Arrest For a Civil Immigration Violation Is "Reasonable" Under the Fourth Amendment Depends In Part On the Competence of the Arresting Officer.

Perhaps recognizing that Miami-Dade's arrest of Mr. Creedle for a suspected civil immigration violation falls outside the limited "cooperation" permitted under federal law, the United States posits that the County's arrest was nonetheless "reasonable" under the Fourth Amendment. In the United States' view, the fact that federal immigration officers ostensibly could have arrested Mr. Creedle consistent with federal law[11] implies that Mr. Creedle's arrest by *County* officers lacking any competency to enforce civil immigration law must have been "reasonable" for Fourth Amendment purposes.

Caselaw contradicts the United States' remarkable assertion that the Fourth Amendment is blind to an arresting officer's competency to enforce civil immigration law. In *Arizona*, for instance, the Supreme Court considered a state statute that required state officers to verify the immigration status of any person who the officer reasonably suspected to be unlawfully present in the United States. *See* 567 U.S. at 411. Citing to two Fourth Amendment decisions, the Court warned that interpreting the statute to allow state

---

[9] This assumes that the County correctional officers who arrested Mr. Creedle were "law enforcement officers" authorized to make warrantless arrests under Florida law. The United States has failed to rebut Mr. Creedle's allegation and argument to the contrary. *See* D.E. 1 at 13; *Pierre v. City of Miramar, Fla., Inc.*, 537 F. App'x. 821, 824-25 (11th Cir. 2013).

[10] By comparison, in the context of interstate cooperation, Fla. Stat. § 941.14 limits warrantless arrest authority for foreign crimes to felonies.

[11] The United States' Fourth Amendment argument repeatedly relies on the supposed fact that the detainer issued for Mr. Creedle was accompanied by an administrative warrant attesting to probable cause of removability. *In fact, no such warrant was issued in Mr. Creedle's case.* Moreover, as stated above, Mr. Creedle disputes that federal immigration officers could have arrested him without a warrant. *See supra* at 1.

officers to detain people "solely to verify their immigration status would raise constitutional concerns." *Id.* at 413 (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The Court expressly linked its Fourth Amendment concerns to the identity of the arresting officers, explaining that "[t]he program put in place by Congress does not allow *state or local* officers to adopt this enforcement mechanism." *Id.* (emphasis added). Similarly, in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), the Court relied on the training and experience of Border Patrol agents to conclude that a traffic stop based on reasonable suspicion that the vehicle "contain[s] aliens who may be illegally in the country" would satisfy the Fourth Amendment. *Id.* at 884-85. *See also United States v. Martinez-Fuerte,* 428 U.S. 543, 567 (1976) (allowing Border Patrol checkpoints without particularized suspicion, but limiting its holding to such Border Patrol checkpoints); *United States v. Cruz-Hernandez*, 62 F.3d 1353, 1356 (11th Cir. 1995) (finding Border Patrol stop reasonable under the Fourth Amendment in part because the "senior border patrol agent" who made the stop "had nine years of experience in detecting and removing undocumented aliens"). The reasonableness of a seizure for a suspected immigration violation thus depends on the competency of the arresting officer to make a civil immigration arrest.

In support of its contrary position, the United States relies on cases which hold that a search or seizure's reasonableness for Fourth Amendment purposes does not change when a state voluntarily restricts its own officers' arrest authority. In *Virginia v. Moore*, 553 U.S. 164 (2008), the Court held that a state's self-imposed restriction on its officers' arrest authority for certain minor misdemeanor offenses did not alter the scope of the Fourth Amendment's protections. Specifically, the Court "conclude[d] that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution" and that a "state['s] restrictions" on such arrest authority "do not alter the Fourth Amendment's protections." *Id.* at 176. The other cases on which the United States relies simply restate this principle. *See United States v. House*, 684 F.3d 1173, 1184 (11th Cir. 2012) ("The Supreme Court has ruled that a traffic stop is reasonable under the Fourth Amendment [ . . . ] even if it is inconsistent with [

. . . ] state law") (citing *Moore*, 553 U.S. at 173-76); *United States v. Clay*, 355 F.3d 1281, 1283 (11th Cir. 2004) (recognizing that a state's self-imposed restrictions are "irrelevant" to a federal court's independent evaluation of the "reasonableness of a search and seizure by state officers"); *United States v. Witten*, No. 13-CR-10022, 2014 WL 3101912, at *6 (S.D. Fla. July 7, 2014) ("[S]tate law does not govern the Fourth Amendment probable cause determination").

These cases do not help the United States. Mr. Creedle's arrest was unreasonable because Miami-Dade lacked any competency to arrest him for civil immigration violations *in the first place*, not because the County voluntarily restricted such pre-existing power. That distinction is crucial because the Supreme Court expressly grounded its holding in *Moore* on the adverse policy effects that arise "when a State *chooses* to protect privacy beyond the level that the Fourth Amendment requires." *Moore*, 553 U.S. at 171. The Court explained that while "[a] State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, [] its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional." *Id.* at 174. To constitutionalize such gratuitous State restrictions, the Court recognized, would discourage states from adopting them – an outcome which would "frustrate rather than further" liberty-enhancing state policies. *Id. See also id.* at 176 ("It would be strange to construe a constitutional provision that did not apply to the States at all when it was adopted to now restrict state officers more than federal officers, *solely because the States have passed search-and-seizure laws that are the prerogative of independent sovereigns*.") (emphasis added). These concerns are wholly inapplicable here because under the federal immigration enforcement scheme Congress created, the County has no power to make civil immigration arrests in the first place.

The County's lack of competence to make civil immigration arrests confirms that its arrest of Mr. Creedle violated "[b]edrock Fourth Amendment principles." *Lopez-Aguilar*, 2017 WL 5634965, at *11. As one district court recently recognized in rejecting the very sort of argument the United States raises here, "even in cases where ICE has or supplies probable cause to believe a noncitizen is deportable for a civil

immigration violation, such probable cause, without more, does not justify the seizure of a person under color of *state* law." *Id.* at 12. "[C]ivil matters," the Court recognized, generally "do not justify arrests or custodial seizures amounting to arrests." *Id.* And while the *federal* government may have an interest in authorizing trained federal immigration enforcement officials to make civil immigration arrests, non-federal entities, by contrast, have "no legitimate interest in effecting [such] seizure[s]" themselves. *Id.* The state interests which make *criminal* arrests "reasonable" for Fourth Amendment purposes therefore do not apply to arrests for suspected civil immigration violations. *See id.* (recognizing that as to such violations, non-federal entities have "no interest in ensuring the 'suspect's' appearance at 'trial,' because [they] may not adjudicate deportability; no interest in preventing the noncitizen from continuing his offense, because [they] may not deport him; and no interest in investigating the incident, because evidence from such investigation will relate only to an adjudication [they] may not conduct of the suitability of a remedy [they] may not order."). Thus, "[o]nly when acting under color of federal authority, that is, as directed, supervised, trained, certified, and authorized by the federal government, may [non-federal] officers effect constitutionally reasonable seizures for civil immigration violations." *Id.* at 13. Because immigration detainers "do not supply the necessary direction and supervision," *id.*, the County's arrest of Mr. Creedle for suspected civil immigration violations violated the Fourth Amendment.

## IV. Mr. Creedle's Arrest Resulted From a Miami-Dade County Policy That Violates the Fourth Amendment by Requiring Detention Regardless of Facts that Undermine Probable Cause.

Miami-Dade County arrested and detained Mr. Creedle based on an order issued by Mayor Gimenez which "direct[ed]" Miami-Dade County's Department of Corrections and Rehabilitation "to honor all immigration detainer requests received from the Department of Homeland Security." *See* D.E. 1, ¶¶36, 64 & Exhibit A. Consistent with the plain language of this directive, Mr. Creedle has plausibly alleged that Miami-Dade "has engaged in a practice of detaining *all* individuals subject to an immigration detainer beyond the time they would otherwise be entitled to release." *Id.* ¶64 (emphasis added). The

Mayor's policy thus results directly in arrests like Mr. Creedle's because it *mandates* arrest even where the arresting County official has reason to question ICE's check-the-box assertion that there is probable cause of removability. This policy of across-the-board detainer compliance regardless of the arresting officer's knowledge of facts that undermine probable cause cannot be reconciled with the Fourth Amendment. *See, e.g.*, *Torres v. Puerto Rico*, 442 U.S. 465, 474 (1979) (statute that authorized searches without probable cause violated Fourth Amendment); *see also City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452-53, 2456 (2015) (invalidating statute that authorized administrative searches without opportunity for pre-compliance review); *Payton v. New York*, 445 U.S. 573, 574-76 (1980) (invalidating statute that authorized home arrests without exigent circumstances).

The United States recognizes this Fourth Amendment problem, but its responses are non-sequiturs. First, it suggests that because "an ICE detainer does not demand blind action," the County was not obligated to detain Mr. Creedle if it had reason to question probable cause of removability. D.E. 26 at 18. The United States misses the point. While ICE did not (and could not) require County officers to arrest Mr. Creedle based solely on the detainer, the *Mayor's directive* did. Because it is well-settled that officers may not rely on requests from others when there is reason to doubt that probable cause actually exists, *see Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."); *Florida v. Harris*, 568 U.S. 237, 244, 248 (2013) (probable cause must be assessed in light of "all the facts surrounding" a particular search or seizure), the County is responsible for its policy of mandating arrests based on *all* ICE detainers even when the arresting officer is aware of facts that undermine probable cause. A policy like the Mayor's that "affords the police *no* discretion" about whether to arrest "flies in the face of common sense that *all* police officers must use some discretion in deciding

when" to effectuate an arrest. *City of Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1991) (second emphasis added); *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005).[12]

The United States also argues that the detainer form itself cures the Fourth Amendment problem by advising the detainer's subject to call ICE if he or she is a U.S. citizen. In the government's view, as long as people have a phone number to call when they are wrongfully detained, there is no constitutional violation. But responsibility for complying with the Fourth Amendment rested on the *County*, not Mr. Creedle. The constitutional violation occurred at the moment that Mr. Creedle was detained. Mr. Creedle's ability to obtain release *after* being unlawfully arrested and detained does not retroactively cure the Fourth Amendment violation. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

## V.       The Fellow Officer Rule Does Not Make the County's Arrests Lawful.

Miami-Dade correctional officers violate the Fourth Amendment when they make warrantless arrests of suspected civil immigration violators based on probable cause findings of ICE. Contrary to the United States' claim, the fellow officer/collective knowledge rule did not permit Miami-Dade jail officers to arrest Mr. Creedle. As Mr. Creedle noted in prior briefing, the fellow officer rule permits arresting officers engaged in a "common investigation" to rely upon the information possessed by members in the group to establish probable cause for a warrantless arrest, as long as the officers have engaged in more than "minimal communication." D.E. 19 at 13-16. (citing *United States v. Ventresca*, 380 U.S. 102, 111 (1965) (rule applies in context of arresting officers engaged in a "common investigation"); *United States v. Willis*,

---

[12] In its motion to dismiss, the County asserted that the Mayor's directive is no longer in force because it was followed by a resolution enacted by the Miami-Dade County's Board of County Commissioners that "requires the federal government to show probable cause of all immigration detainer requests." But the operational impact of the resolution's passage on the Mayor's order is a factual question inappropriate for decision on a motion to dismiss, when Mr. Creedle has plausibly pleaded that the County responds reflexively to detainer requests by arresting the detainer's subject. And, in any event, the Board's resolution does not address how County officials should respond when they are aware of facts that *undermine* ICE's purported probable cause determination.

759 F.2d 1486, 1494 (11th Cir. 1985) (a "reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation")).[13]

Neither the County nor the United States argues that, in Mr. Creedle's case, there was a common investigation or communication, apart from the lodging of the detainer. Therefore, the fellow officer rule cannot apply.[14] Moreover, because Miami-Dade correctional officers lack both state and federal authority to make a warrantless arrest, they cannot be part of a "common investigation" that would serve as a predicate for relying on another officer's information. *See Pierre*, 537 F. App'x. at 824-25 (fellow officer rule does not apply when officer in question lacked warrantless arrest authority). Even if correctional officers had authority to make a warrantless arrest, they could not rely on information from an ICE officer to make a probable cause determination regarding a civil immigration violation. As explained above, county officials lack federal authority to enforce civil immigration law because there is no section 1537(g) agreement deputizing municipal officers as ICE agents. *See Ochoa*, 2017 WL 3476777 at *14 (expressing skepticism that the fellow officer rule permits "mixing" probable cause determinations between federal immigration and local officers).

None of the cases cited by the United States establish that the fellow officer rule authorized Miami-Dade correctional officers to arrest Mr. Creedle. *Liu v. Phillips*, 234 F.3d 55, 55 (1st Cir. 2000), involved a joint operation with considerable communication between local law enforcement and immigration authorities. Both immigration and local officers with arrest authority were at the scene when the arrest—a criminal arrest—was executed. *United States v. Ashley* also involved a joint effort and significant

---

[13] As mentioned in prior briefing, courts have held that the fellow officer rule does not apply when local jail officials detain people based on a probable cause finding of a civil immigration violation made by federal immigration officers. D.E. 19 at 13 (citing *Ochoa*, 2017 WL 3476777 at *13-14; *Santoyo v. United States*, No. 5:16-CV-855-OLG, 2017 WL 2896021, at *6 (W.D. Tex. June, 5 2017)).

[14] Even if no common investigation or communication was required, the arrest was unlawful because ICE lacked probable cause to arrest Mr. Creedle, who was known to ICE to be a U.S. citizen. No probable cause by ICE can be attributed to the County correctional officers.

communication among criminal law enforcement officers with warrantless arrest authority. 569 F.2d 975, 983 (5th Cir. 1978).

The United States also cites to *United States v. Webster*, 750 F.2d 307, 324 (5th Cir. 1984), for the idea that an officer can arrest someone without knowing any of the underlying facts establishing probable cause. *Webster*, however, supports Mr. Creedle's position. *Webster* involved law enforcement officers with arrest authority working as a team to find a criminal suspect. The Fifth Circuit found that the fellow officer rule did not apply because no officer had sufficient facts to supply probable cause to arrest the defendant, even when the officers' information was pooled. The court noted that the arresting officer failed to communicate sufficiently by neglecting to communicate the identity of the defendant to the other officers before he arrested him. *Webster* stands for the proposition that the fellow officer rule only applies to scenarios in which officers with warrantless arrest authority are working as a law enforcement team and are engaged in more than minimal communication. Even if the arresting officer is unaware of the facts establishing probable cause for a warrantless arrest, he or she must be part of a common investigation and there must be at least minimal communication between the officers. In Mr. Creedle's case, there was neither.

The United States cites to numerous cases that are irrelevant because they do not involve the collective knowledge doctrine or warrantless arrests. *See Furrow v. U.S. Bd. Of Parole*, 418 F. Supp. 1309, 1312 (D. Me.1976) (federal parole violation warrant in criminal case justified detention of defendant finishing state sentence); *Andrews v. State*, 962 So.2d 971, 973 (Fla. Dist. Ct. App. 2007) (arrest pursuant to armed forces warrant upheld when military officer with arrest authority was present at scene); *United States v. McDonald*, 606 F.2d 552, 553 (5th Cir. 1979) (arrest by local officer upheld because of reasonable belief that a federal criminal arrest warrant existed). Because these cases involved criminal federal warrants directed to the state or local custodian, none is applicable here. *United States v. Cardona,* 903 F. 2d 60 (1st

Cir. 1990), is also irrelevant, as it involved the question of whether a local law enforcement officer could execute a warrant issued by the state's parole board.

The United States also cites to *United States v. Mendoza*, 849 F. 3d 408, 412 (8th Cir. 2017). Although that case involved a wrongfully detained U.S. citizen, it involved very different facts and legal claims from those in Mr. Creedle's case and was decided on summary judgment, after discovery had taken place. The court in *Mendoza* found that the local jails officials had conducted an "adequate investigation" and had *not* "overlook[ed] differentiating information" regarding *Mendoza*'s U.S. citizenship. Mendoza, 849 F.3d at 419. Here, in contrast, Mr. Creedle has alleged that the County conducted no investigation and overlooked Mr. Creedle's statement that he was a U.S. citizen. More importantly, the court in *Mendoza* did not consider the legal claim raised by Mr. Creedle, namely that local jail officials cannot lawfully seize a person for a suspected civil immigration violation. The *Mendoza* court assumed that local jail officials can detain people when there is probable cause that they are removable from the United States.

CERTIFICATE OF SERVICE

I hereby certify that, on November 28, 2017, I electronically served a true and correct copy of the foregoing on counsel for Defendants via transmission of a Notice of Electronic Filing generated by the CM/ECF system of the U.S. District Court of the Southern District of Florida.

Respectfully submitted,*

| | |
|---|---|
| By: /s/ Rebecca Sharpless | AMIEN KACOU |
| REBECCA SHARPLESS | Florida Bar No. 44302 |
| Florida Bar No. 0131024 | ACLU FOUNDATION OF FLORIDA, INC. |
| IMMIGRATION CLINIC | 4023 N. Armenia Avenue, Suite 450 |
| UNIVERSITY OF MIAMI SCHOOL OF LAW | Tampa, FL 33607 |
| 1311 Miller Drive Suite E-273 | Tel: (813) 288-8390 |
| Coral Gables, Florida 33146 | |
| Tel: (305) 284-3576, direct | NANCY ABUDU |
| Tel: (305) 284-6092, clinic | Fla. Bar No. 111881 |
| rsharpless@law.miami.edu | ACLU FOUNDATION OF FLORIDA, INC. |
| | 4343 W. Flagler St., Suite 400 |
| IRA J. KURZBAN | Miami, FL 33134 |
| Florida Bar No. 225517 | Tel: 786-363-2700 |
| EDWARD F. RAMOS | Fax: 786-363-1448 |

Florida Bar No. 98747
IAN K. SHAW
Florida Bar No. 115167
KURZBAN KURZBAN WEINGER
TETZELI & PRATT, P.A.
2650 SW 27th Avenue
Second Floor
Miami, FL 33133
Tel: 305-444-0060
Fax: 305-444-3503

\* Law students Candelario Saldana and Pablo Pazos of the University of Miami School of Law contributed to the drafting of this pleading.