**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:17-cv-22477-KMW**

GARLAND CREEDLE,

     Plaintiff,

v.

MIAMI-DADE COUNTY, Florida;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED
STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT; and
the UNITED STATES OF AMERICA,

     Defendants.

_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO FEDERAL AGENCY DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

In Counts III and IV of the Second Amended Complaint (DE 116), Mr. Creedle seeks prospective declaratory relief that ICE's policy and practice of issuing detainers to Miami-Dade County either without a formal ICE-County agreement or without probable cause violates the Administrative Procedure Act ("APA") and the Fourth Amendment.

In their motion to dismiss (DE 134), the U.S. Department of Homeland Security ("DHS") and the U.S. Immigration and Customs Enforcement ("ICE") (collectively, the "Federal Agency Defendants" or "Federal Defendants") seek dismissal of these counts on grounds this Court has largely already considered and properly rejected. Despite the Federal Defendants' renewed protestations otherwise, Mr. Creedle has standing to seek prospective relief against ICE's illegal actions, and ICE's non-binding policy change regarding detainers does nothing to moot this case. On the merits, Mr. Creedle has stated claims that ICE's issuance of detainers without probable cause and in contravention of the limits imposed by federal statutes violates the Administrative

Procedure Act and the Fourth Amendment. Consequently, the Court should deny the Federal Agency Defendants' motion to dismiss.

BACKGROUND

I.    **Statement of Facts**[1]

Mr. Creedle was born in Honduras and has been a U.S. citizen since the moment of his birth by virtue of his father's U.S. citizenship. When Mr. Creedle came to the United States from Honduras in 2015, immigration enforcement officials arrested him, and put him in administrative removal proceedings before an immigration judge. On April 28, 2015, ICE filed a motion with the immigration judge stating that the proceedings should be terminated on the grounds that Mr. Creedle is a U.S. citizen. In the motion, ICE stated that Mr. Creedle had submitted documentation showing that he had acquired citizenship through his father, Willie Edward Creedle, and that termination was warranted because Mr. Creedle was a U.S. citizen. On April 30, 2015, an immigration judge granted ICE's motion and terminated proceedings against Mr. Creedle.

On the evening of March 12, 2017, Mr. Creedle was arrested after an alleged domestic dispute and taken to Miami-Dade County jail, where he was held on bond. Mr. Creedle was never charged in court with the offense for which the police arrested him. The State of Florida issued a "No Action" in his case. Early the next morning, on March 13, 2017, MDCR received an immigration detainer issued by ICE, which named Mr. Creedle as its subject.

Checkboxes on the detainer indicated that Mr. Creedle was "a removable alien" under civil immigration law and that this determination was based on a "biometric confirmation of the

---

[1]    The following facts are set forth in the SAC and are restated here as relevant to Mr. Creedle's claims against the Federal Defendants. *See Int'l Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1277 (11th Cir. 2001) ("We consider allegations in the complaint as true for the purposes of the motion.").

2

subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law." *See* D.E. 48-4. Apart from the Officer's check marks next to these boilerplate statements, the detainer provided no additional information concerning this supposed "biometric confirmation" or "records check."

The detainer asked MDCR to re-arrest Mr. Creedle and jail him for an additional 48 hours beyond the time he would otherwise be entitled to release. The detainer did not allege probable cause to believe that Mr. Creedle had committed any crime. The detainer was not supported by a warrant (judicial or administrative) or any other probable cause determination, nor did it include any individualized assessment of Mr. Creedle's risk of flight.

On March 13, 2017, during normal business hours, Mr. Creedle posted bond. Instead of releasing him, MDCR re-arrested and continued to detain Mr. Creedle pursuant to the ICE detainer. MDCR continued to hold Mr. Creedle through the night of March 13, 2017 until the following day, when ICE cancelled the detainer.

## II.    Procedural History

Mr. Creedle filed this lawsuit on July 5, 2017, against Miami-Dade County and its Mayor, Carlos Gimenez. DE 1. On June 1, 2018, Mr. Creedle filed his First Amended Complaint ("FAC") to add claims against DHS, ICE, and ICE officer Alexander Martinez, who issued the detainer. DE 48. As relevant here, Counts IV and V of the FAC sought declaratory relief against DHS and ICE, alleging that the detainer ICE issued against Mr. Creedle violated the statutes governing ICE's arrest and detention authority and the Fourth Amendment. Miami-Dade County and Officer Martinez also filed motions to dismiss the claims against them.

3

On November 8, 2018, the Court issued an opinion on the Defendants' motions to dismiss. *See Creedle v. Miami-Dade County*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018). The Court dismissed Mr. Creedle's *Bivens* claim against Officer Martinez, as well as Mr. Creedle's Due Process claims against the County. But the Court concluded that Mr. Creedle stated valid claims against the Federal Agency Defendants under the APA and the Fourth Amendment. *Id*. at 1295–300. On jurisdictional issues, the Court rejected the Defendants' standing and mootness arguments with respect to Mr. Creedle's claims for *prospective* relief, *id*. at 1286–92, but held that Mr. Creedle's claims against Federal Defendants for *retrospective* declaratory relief were moot, *id*. at 1292–93.

Plaintiff filed a Second Amended Complaint ("SAC") on December 10, 2018. DE 116. The SAC's principal purpose was to add claims for retrospective monetary damages against the United States under the Federal Tort Claims Act ("FTCA"). The SAC also modified Mr. Creedle's requests for declaratory relief against the Federal Agency Defendants to clarify: (1) that these claims do not include monetary damages claims; and (2) that the requests seek *prospective* relief. *See* D.E. 116, ¶¶ 86–95. The Federal Defendants filed their motion to dismiss the SAC's declaratory relief claims on March 12, 2019. DE 134.

**ARGUMENT**

**I.   THE COURT HAS JURISDICTION TO DECIDE MR. CREEDLE'S REQUESTS FOR PROSPECTIVE DECLARATORY RELIEF AGAINST THE FEDERAL DEFENDANTS.**

**A.  Mr. Creedle has Article III standing.**

In their motion to dismiss, the Federal Defendants resurrect their argument that Mr. Creedle lacks standing to seek prospective declaratory relief against ICE's practice of issuing detainers to Miami-Dade County without making an individualized assessment of the detainer subject's likelihood of escape and without a formal agreement under Section 1357(g). Standing is absent,

4

the Federal Defendants argue, because now that ICE knows that Mr. Creedle is a U.S. citizen and has updated one database accordingly, it will not issue another detainer against him in the future. This Court properly rejected that argument the first time around, *see Creedle*, 349 F. Supp. 3d at 1286-91, and the Federal Agency Defendants provide no persuasive reason for the Court to reconsider that ruling here.

A party has standing to seek declaratory or injunctive relief "only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical— threat of future injury.'" *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994)). "[W]hen standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000).

As this Court properly concluded, Mr. Creedle has presented "allegations which could reasonably support a finding that Mr. Creedle is likely to be subject to future injury from the application of the policy he challenges." *Creedle*, 349 F. Supp. 3d at 1287 (citing *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999)). Mr. Creedle has presented allegations which reasonably show that his U.S. citizenship will not stop ICE from issuing another detainer against him. After all, Mr. Creedle's U.S. citizenship did not prevent ICE from issuing a detainer against him in 2017—and that was nearly two years *after* ICE filed papers with an immigration judge recognizing Mr. Creedle's U.S. citizenship. *See* D.E. 116, ¶¶ 50, 56. That ICE issued a detainer against Mr. Creedle once before despite its knowledge that he was a U.S. citizen "suggests that Mr. Creedle is susceptible to being held pursuant to a detainer in the future." *Creedle*, 349 F. Supp. 3d at 1288; *see Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336

(11th Cir. 2013) (a "plaintiff's exposure to illegal conduct in the past is…'evidence bearing on whether there is a real and immediate threat of repeated injury'") (quoting *O'Shea v. Littleton,* 414 U.S. 488, 496 (1974)).[2]

The Federal Defendants' attempt to circumvent this troubling reality with a declaration from an ICE employee who attests that ICE updated records in one database to reflect Mr. Creedle's U.S. citizenship. *See* Decl. of Assist. Field Office Dir. Garrett J. Ripa ("Ripa Declaration"), DE 134-1. But the Federal Defendants already tried this tactic with a different declaration the first time around (*see* DE 69-1), and the Ripa Declaration is just as "deficient in information" as the Federal Defendants' previous one. *See Creedle*, 349 F. Supp. 3d at 1288. The Ripa Declaration acknowledges that ICE created "database records" that Mr. Creedle "was a Honduran citizen," Ripa Decl., ¶ 4, and then "incorporated" these records into something called the "Enforcement Integrated Database (EID)."[3] *Id*. According to Mr. Ripa, the mistake ICE made by issuing a detainer against Mr. Creedle on March 13, 2017 no longer endangers Mr. Creedle

---

[2]    Regrettably, the unlawful detainer ICE issued for Mr. Creedle is no outlier: "[A]s other courts have recognized, U.S. citizens are frequently held pursuant to detainers." *Creedle*, 349 F. Supp. 3d at 1289 (citing cases). And Miami-Dade appears to be no exception; discovery in this case suggests that Miami-Dade County may have subjected more than eighty U.S. citizens to re-arrest and detention on immigration detainers during the same two-year period the detainer against Mr. Creedle was issued. *See* Bianca Padró Ocasio, *Dozens of U.S. Citizens May Have Been Targeted by ICE at Miami Jail, ACLU Says*, Orlando Sentinel (Mar. 20, 2019, 11:55 AM), http://bit.ly/2WGrHzG. While the apparent prevalence of detainers issued to U.S. citizens goes beyond the facts pled in Mr. Creedle's complaint, it further undermines the Federal Defendants' suggestion that the detainer it issued against him can be dismissed as a one-off mistake.

[3]    The Federal Defendants make much of the facts surrounding Mr. Creedle's placement in removal proceedings in 2015, but those proceedings are only relevant because they show that Federal Defendants knew about Mr. Creedle's U.S. citizenship long before they issued the detainer against him in 2017. The circumstances surrounding Mr. Creedle's entry into the United States in 2015, by contrast, are irrelevant to the claims in this case.

because this lawsuit prompted ICE to "update[]…. information in EID to reflect that he was a United States citizen." Ripa Decl., ¶5.

As an initial matter, the Federal Defendants' attempt to defeat standing through an untested declaration by an ICE employee runs up against the limits of a motion to dismiss. When a defendant challenges a plaintiff's standing on "a motion to dismiss," the challenge must be "based exclusively on [the] plaintiff's pleadings." *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Haase v. Sessions,* 835 F.2d 902 (D.C. Cir. 1987)). None of the conditions necessary to allow a court to consider documents outside the complaint at the motion to dismiss stage are present here.[4] Notably, the Ripa Declaration—like the previous declaration submitted by Federal Defendants—does not directly attack any of the facts pled by Mr. Creedle; instead, it improperly invokes facts outside the pleadings altogether. *See* D.E. 89 at 4–9 (citing *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003); *Garcia v. Copenhaver, Bell & Associates*, 104 F.3d 1256, 1261 (11th Cir. 1997); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). Thus, the factual assertions in the Ripa Declaration fall outside the bounds of Mr. Creedle's SAC and, as a consequence, they are not properly raised in a motion to dismiss.

Of course, the Federal Defendants are free to rely on declarations or other evidence outside the Complaint in a motion for summary judgment—but only *after* Plaintiff has had a fair

---

[4] Despite Federal Defendants' attempt to argue otherwise, it is improper for a court to consider a document outside the four corners of the complaint when faced with a motion to dismiss under Rule 12(b)(6). The very narrow exception to this rule that Federal Defendants invoke applies *only* when (1) the plaintiff has referred to the document in the complaint; (2) the document is central to the plaintiff's claim; and (3) the defendant attaches the document to a motion to dismiss. *See Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.")).

opportunity to test ICE's assertions through discovery. *Bischoff*, 222 F. 3d at 879 ("[A] district court *cannot* decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone but *must* hold an evidentiary hearing.") (emphasis in original); *see also Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1038 (11th Cir. 2008) (where standing issue "reaches us on a motion to dismiss, we must presume that a plaintiff's allegations are sufficient to establish the facts alleged"). Until then, any argument based on facts outside of Mr. Creedle's amended complaint is premature.

Even if the Court considers the Ripa Declaration, Federal Defendants have still failed to overcome the deficiencies the Court found with its previously-submitted declarations. Crucially, the Federal Defendants do not allege that the EID database is the *only* government database ICE uses to decide whether to issue a detainer. And, as this Court has noted, there appear to be "at least *four* databases" ICE uses for this purpose. *See Creedle*, 349 F. Supp. 3d at 1288 n.7 (emphasis added). Thus, ICE's belated fix to a single database is of little help if Mr. Creedle's citizenship information remains uncorrected in other government databases ICE regularly consults when deciding whether to issue a detainer.[5]

As the Court has already found, "[a] cursory statement that one of ICE's databases reflects that Mr. Creedle is a U.S. citizen does not overcome the factual allegations . . . supporting an

---

[5] The Federal Defendants' reliance on Mr. Creedle's second arrest by Miami-Dade County fails for similar reasons. While ICE apparently issued no detainer for Mr. Creedle after his February 2018 arrest, that fact alone "does not establish that he will not be held pursuant to a detainer again." 349 F. Supp. 3d at 1289. The sole evidence ICE has provided regarding its detainer response is a cryptic one-page document (ECF No. 134-3) with no identified author or recipient. And while the document states that "I.C.E. records indicate that this subject is a United States citizen," it contains no information regarding what "records" were consulted, who did the consulting, and the process ICE used to reach this conclusion. With these questions unanswered, "the factual circumstances related to this arrest" remain "far too unclear to infer that the likelihood of Mr. Creedle being held pursuant to a detainer again is now 'too speculative' to confer standing." *Creedle*, 349 F. Supp. 3d at 1289.

inference that he is sufficiently likely to suffer the same injury in the future." *Creedle*, 349 F. Supp. 3d at 1288. The Federal Defendants' challenge to Plaintiff's standing should therefore once again be rejected because, "viewing the facts alleged in the amended complaint in the light most favorable to Mr. Creedle, he has alleged facts demonstrating that his injury is sufficiently likely to occur again and he therefore has standing to proceed with his claims for *prospective* declaratory relief." *Creedle*, 349 F. Supp. 3d at 1291 (emphasis in original).

### B.   ICE's change to its detainer policy does not moot Mr. Creedle's claims.

According to ICE, the fact that its policy now requires that "detainers must be accompanied by a signed administrative warrant of arrest" moots Plaintiff's request for prospective declaratory relief. DE 134, at 10–11. That argument is doubly flawed, and the Court should once again reject it.

First, the argument fails on its own terms because as this Court recognized, the policy change ICE touts in its motion to dismiss "is not binding on th[e] agency and could be rescinded at any time." *Creedle*, 349 F. Supp. 3d at 1292. Indeed, in the very policy that the Federal Defendants cite, ICE expressly disclaims that the policy change is "legally required," and expressly provides that the policy "may be modified, rescinded, or superseded at any time without notice." *See* ICE Policy No. 10074.2 at 6. Thus, this is hardly a case where ICE has meaningfully "professed [its] commitment to changed ways." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (citation omitted). To the contrary, because ICE has pointedly refused to bind itself to its new policy requiring detainers to be accompanied by administrative warrants, ICE can hardly establish that there is "no reasonable chance" it will revert

9

back to the detainer issuance practices it deployed at the time the detainer was issued against Mr. Creedle. *Id*. at 1276.[6]

More basically, ICE's policy changes cannot moot Plaintiff's claims because ICE's practice of issuing administrative warrants does nothing to undercut Plaintiff's claims for declaratory relief against the Federal Defendants. In Counts III and IV of the SAC, Plaintiff alleges that ICE exceeded its statutory authority and violated the Fourth Amendment by issuing detainers without any individualized assessment of flight risk or probable cause, and without any formal agreement with the County as contemplated by 8 U.S.C. § 1357. Administrative warrants are "issued by DHS personnel without a judicial warrant or independent finding of probable cause that the person subject to the warrant has committed a crime." *Ochoa v. Campbell*, 266 F. Supp. 3d 1237, 1243 (E.D. Wash. 2018). In sharp contrast to judicial warrants, which must be obtained from a neutral magistrate who conducts an independent probable cause analysis based on individualized facts, the "probable cause" determination on an administrative warrant consists of a checkbox on a fill-in-the-blank form[7] and are issued by *ICE itself*. It is unclear whether the sources ICE consults to authorize administrative warrants differ in any meaningful way from those used for detainers. As a consequence, ICE's current policy of attaching an administrative warrant to its detainers does nothing to cure the statutory and constitutional defects that infect detainers. *See El Badrawi v. DHS*, 579 F. Supp. 2d 249, 276 (D. Conn. 2008) (arrests pursuant to an administrative warrant "must…be treated as warrantless" for purposes of "federal constitutional law").

---

[6]     Indeed, internal ICE emails reportedly show that in some cases, ICE officers routinely circumvent the administrative warrant requirement by obtaining pre-signed administrative warrant forms from supervisory ICE officers and *then* filling in the details of the warrant's subject without the supervisor's review. Bob Ortega, *ICE Supervisors Sometimes Skip Required Review of Detention Warrants, Emails Show*, CNN (Mar. 13, 2019), https://cnn.it/2CNh5Y2.

[7]     *See* ICE, Sample Warrant of Arrest of Alien, http://bit.ly/2IbHzWO.

Furthermore, Mr. Creedle has alleged injuries due not only to ICE's continued practice of issuing detainers without an individualized determination of flight risk, but also due to ICE's continued practice of issuing detainers for arrest without a written agreement pursuant to 8 U.S.C. § 1357. As discussed below, that practice violates the limits of ICE's statutory authority for reasons that are unaffected by ICE's issuance of administrative warrants. ICE's stated policy change, therefore, does nothing to moot Mr. Creedle's claims.

## II.   MR. CREEDLE HAS STATED VALID CLAIMS AGAINST THE FEDERAL DEFENDANTS.

The Federal Defendants' arguments that Mr. Creedle has failed to state a claim for relief are just as baseless as their threshold jurisdictional arguments; indeed, the Court properly rejected most of them already in the context of its order on the previous motions to dismiss. And nothing in the Federal Defendants' motion provides a compelling basis for the Court to reconsider its prior rulings.

### A.   Mr. Creedle has stated a claim that the Federal Defendants exceeded their statutory authority by issuing detainers without a formal written agreement with the County.

To begin, Mr. Creedle has stated a claim that the Federal Defendants lacked statutory authority to issue a detainer against Mr. Creedle. Because the Immigration and Nationality Act ("INA") does not give ICE the power to authorize the County to make immigration arrests absent a formal agreement (and the procedural protections that go with it), the issuance of detainers to the County exceeds ICE's statutory authority. *See* 5 U.S.C. § 706(2)(C) (directing courts to hold unlawful agency action "in excess of statutory jurisdiction, authority, or limitations"); *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1874 (2013) (courts "take[] seriously, and apply[] rigorously, in all cases, statutory limits on agencies' authority. Where Congress has established a clear line, the agency cannot go beyond it."); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355,

374 (1986) (an agency "literally has no power to act . . . unless and until Congress confers power upon it").

As this Court has already concluded, ICE lacks the statutory authority to issue detainers to the County absent a formal agreement between the County and ICE under 8 U.S.C. § 1357(g). Because the County and ICE have no such agreement in place (and none of the important protections that go along with it), ICE lacks authority to authorize the County to conduct immigration-based arrests on its behalf. *See Creedle*, 349 F. Supp. 3d at 1301-06. That conclusion flows inexorably from the language and structure of the statutes governing the limited cooperation by localities in civil immigration enforcement.

The INA authorizes three "limited circumstances in which state officers may perform the [civil arrest] functions of an immigration officer." *Arizona v. United States*, 567 U.S. 387, 409 (2012) (citing 8 U.S.C. § 1357(g)(l); § 1103(a)(10); § 1252c). Of the three authorizations, only an agreement under 8 U.S.C. § 1357(g)(l) ("Section 287(g)"), would permit non-federal officials to make civil immigration arrests based on detainers or immigration warrants.[8] Section 287(g) permits cooperative agreements whereby non-federal officials "determined by the [DHS Secretary] to be qualified" are authorized "to perform [the] function of an immigration officer" as to the "investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(l). Section 287(g) requires these non-federal officials to "receive[] adequate training regarding the enforcement of relevant Federal immigration laws" and be "subject to the direction and supervision of the [DHS Secretary]." 8 U.S.C. §1357(g)(2)-(3); *Arizona*, 567 U.S. at 409.

---

[8]     These agreements are commonly called "Section 287(g)" agreements because 8 U.S.C. § 1357(g) corresponds to Section 287(g) of the Immigration and Nationality Act.

12

Such training is a critical feature of the system "Congress created." *Arizona*, 567 U.S. at 408. To protect the integrity of Congress's scheme, the INA preempts local officers from engaging in the "function[s] of an immigration officer," such as arrests, absent a formal agreement under 8 U.S.C. § 1357(g)(1). Those require training and certification. *See Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 296 F. Supp. 3d 959, 973 (S.D. Ind. 2017) (an arrest pursuant to an immigration detainer "exceeds the 'limited circumstances' in which state officers may enforce federal immigration law and thus violates 'the system Congress created'") (quoting *Arizona*, 567 U.S. at 408).

While the INA authorizes local officers to "cooperate with federal officials" without a formal agreement, §1357(g)(10), it does not authorize Federal Defendants to request or encourage conduct by local officers that exceeds "cooperation" absent a formal agreement. 8 U.S.C. § 1357(g)(2)–(3); *Arizona*, 567 U.S. at 409. Non-federal civil immigration arrests, like the County's arrest of Mr. Creedle, exceeds "cooperation" as contemplated under Section 287(g)(l0)(B) of the INA. This provision of the INA—which is a saving clause, not an affirmative grant of authority— must be construed narrowly in light of other provisions of the INA.

*Arizona* itself strongly supports this conclusion. The Supreme Court gave several examples of actions that likely constituted "cooperation" under § 1357(g)(10). Notably, each example involved local officers playing a supporting role as *federal* officers perform immigration-officer functions, "includ[ing] situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." 567 U.S. at 410. These traditional forms of "cooperation" are far removed from the core immigration function of detaining an individual on suspicion of a civil immigration violation, even where a detainer request has issued.

13

Even more importantly, the Supreme Court in *Arizona* did *not* include detainers among its examples of cooperation. It omitted detainers even though the United States insisted in its brief in *Arizona* that arrests pursuant to detainers *were* an example of permissible cooperation, *see* Brief for the United States at 54, *Arizona*, 567 U.S. 387 (2012) (No. 11-182), so there is little question the issue was squarely before the Court. Furthermore, the Court described the one INA provision that mentions a "detainer" (8 U.S.C. § 1357(d)), as allowing states to "respond[] to requests for *information* about when an alien will be released from their custody"—without mentioning arrest or detention. *Arizona*, 567 U.S. at 410 (emphasis added). In concluding that arrests pursuant to detainers fall outside the scope of § 1357(g)(10)(B), the court in *Lopez-Aguilar* observed that this "negative implication invited by the *Arizona* majority opinion is difficult to avoid." 296 F. Supp. 3d at 974.

The error in the defendants' interpretation appears to derive from a misreading of *Arizona*'s holding. The Court explained that the case before it was an easy one because "no coherent understanding of the term [cooperation] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. That statement does *not* endorse the idea that § 1357(g)(10)(B) permits local officers to engage in *any* immigration function as long as it was in response to an ICE request. Rather, the Court merely held that "unilateral state action to detain" went "*far beyond*" what Congress could have meant in § 1357(g)(10)(B). 567 U.S. at 410 (emphasis added); *see also Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 463–65 (4th Cir. 2013) (*Arizona* "makes clear that under Section 1357(g)(10) local law enforcement officers cannot arrest aliens for civil immigration violations absent, *at a minimum*, direction or authorization by federal officials") (emphasis added). In other words, *Arizona* established that

14

federal direction is necessary, but not always *sufficient* on its own to provide local officials with the additional authority required to partake in immigration enforcement functions, including detaining and arresting individuals for being removable from the United States.

In each instance where Congress authorized non-federal enforcement of civil immigration laws, Congress expressly used the word "authorize" in relation to delegated arrest authority. 8 U.S.C. §§ 1357(g)(l ), (5); § 1103(a)(10); § 1252c(a); *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1159 (Mass. 2017) (observing that "[i]n those limited instances where the [INA] affirmatively grants authority to [non-federal] officers to arrest, it does so in more explicit terms than those in [8 U.S.C.] § 1357(g)(l0).").[9] Furthermore, the one reference to detainers in the INA only authorizes *requests for notification* of an individual's pending release from criminal custody related to drug crimes. 8 U.S.C. § 1357(d); *Arizona*, 567 U.S. at 410.[10] It does not authorize detainers requesting

---

[9]     By contrast, other intergovernmental arrangements touching on civil immigration enforcement under the INA do not authorize arrests and, therefore, do not require a Section 287(g) agreement. *See, e.g.*, 8 U.S.C. § 1373 (prohibiting restrictions on communications with any government entity regarding the immigration or citizenship status of any individual); 8 U.S.C. § 1228(a)(1) (directing the Attorney General to "provide for the availability of special removal proceedings at certain Federal, State, and local correctional facilities for aliens convicted" of certain criminal offenses); 8 U.S.C. § 1103(a)(11)(B) (allowing the Attorney General to contract with local authorities to use local facilities in the detention of persons held under federal authority).

[10]     This interpretation is consistent with the history of immigration detainer practice when this provision was first enacted: at that time, federal immigration authorities used detainers "to request that a law enforcement agency transfer an alien to [federal immigration] custody at the completion of the alien's criminal sentence, or notify [federal immigration authorities] prior to the alien's release," and not normally "to request that a person be held after he or she would otherwise have been released for any criminal offense so that [federal immigration authorities] could investigate the person's removability and/or take custody." KATE M. MANUEL, CONG. RESEARCH SERV., R42690, IMMIGRATION DETAINERS: LEGAL ISSUES 4 (2015); *see Vargas v. Swan*, 854 F.2d 1028, 1035 (7th Cir. 1988) (describing "detainers" as nothing more than "notice document[s]" which "merely serve[d] to advise" local law enforcement of federal immigration enforcement officials' interest in the detainer's subject); *Prieto v. Gulch*, 913 F.2d 1159, 1164 (6th Cir. 1990) ("The detainer notice does not claim the right to take a petitioner into custody in the future nor does it ask the warden to hold a petitioner for that purpose."); *Dearmas v. INS*, No. 92-8615, 1993 WL 213031 (S.D.N.Y. June 15, 1993) ("The standard INS detainer notice... cannot be treated as a

arrest in *any* context, including for an arrest involving an alleged domestic dispute. *See United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). Indeed, Defendant DHS's own written guidance on Section 287(g)(10)(B), submitted in *Arizona*, demonstrates that arrests based on detainers, administrative warrants, or any other action that is the function of an immigration officer should *not* be understood as "cooperation … in the identification, apprehension, detention, or removal of aliens" contemplated by Section 287(g)(10)(B).[11]

This Court has recognized that "if 'otherwise cooperate' under Section 1357(g)(10)[] . . . were read to allow local law enforcement to arrest individuals for civil immigration violations at the request of ICE, the training, supervision and certification pursuant to a formal agreement between DHS and state officers described in the remaining provisions of Section 1357(g) would be rendered meaningless." *Creedle*, 349 F. Supp. 3d at 1304 (citation omitted). For example, 8 U.S.C. § 1252c authorizes non-deputized local officers to make

---

request to hold an inmate at the end of his sentence until the INS can take him into custody. Instead, the INS detainer... can only be viewed as a notification procedure which the INS utilizes to facilitate its deportation considerations...."). There is no specific mention of intent to authorize local detention of suspected removable aliens beyond their period of criminal custody in the statute. *See Whitman v. American Trucking Ass'n, Inc.,* 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

[11]     U.S. Dep't of Homeland Sec., Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13–15 (2015), https://www.dhs.gov/sites/default/files/publications/guidance-state-local-assistance-immigration-enforcement.pdf. (providing a list of qualifying "Cooperation and Other Permissible Actions," which does not include arresting or detaining individuals based upon detainer requests but *does* include "exercising certain immigration authorities delegated to it by DHS pursuant to a written agreement").

immigration arrests when three conditions are met: (1) the person reentered the country after a previous felony conviction in the United States, (2) ICE confirms the person's status, and (3) ICE plans "to take the individual into Federal custody." 8 U.S.C. § 1252c(a). Yet on Federal Defendants' theory, where the second and third requirements are satisfied, an officer may arrest under subsection (g)(10)(B)—whether or not the first requirement is met. The Federal Defendants' reading would also run contrary to the Supreme Court's refusal to "give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law," especially in cases involving the balance of responsibilities between federal and state authorities. *United States v. Locke*, 529 U.S. 89, 106–07 (2000).

The legislative history of § 1357(g) confirms that Congress never imagined that § 1357(g)(10)(B)'s narrow savings clause would authorize widespread local arrests. To the contrary, the enactment of § 1357(g) was premised on Congress's understanding that local officers lacked immigration arrest authority *entirely*. As Members explained, there was "nothing" local officers could do when they encountered a potentially removable non-citizen "other than calling the local INS officer to report the case." 142 Cong. Rec. H2476-77 (Mar. 20, 1996) (Rep. Latham); *see id*. H2477 (Rep. Doolittle) (stating that "[f]ederal law does not allow" a removable individual apprehended by police "to be held": "All the local law enforcement can do is call up the INS and notify them."); 142 Cong. Rec. H2191-92 (Mar. 13, 1996) (history of § 1252c) (similar). The solution Congress provided was § 1357(g) agreements, which allow only "specially trained State officers to arrest and detain aliens." S. Rep. No. 104-249, at 20 (1996). If Congress had understood itself to be creating or preserving local authority to arrest *outside* that scheme, surely someone would have mentioned it.

17

The Federal Defendants continue to "rel[y] heavily" on *City of El Cenizo, Texas v. Texas*, 890 F.3d 164 (5th Cir. 2018) to support their argument that ICE has statutory authority to issue detainers absent a 287(g) agreement, but they fail to grapple with this Court's explanation of why *El Cenizo*'s dicta is neither "persuasive [n]or helpful" in deciding this issue. *Creedle*, 349 F. Supp. 3d at 1297, 1298. As this Court has already noted,

> [t]he procedural posture [in *El Cenizo*]— reviewing the grant of a preliminary injunction enjoining the enforcement of a state law—does not address the very different standard involved here—reviewing a motion to dismiss—where the Court takes as true all well-pled allegations . . . and views all facts in the light most favorable to Mr. Creedle.

*Id*. at 1298. Further, the *El Cenizo* court simply asserted that any local conduct is permissible so long as there is a "predicate federal request," but did not meaningfully address any of the arguments set forth above, including but not limited to the following: that the INA dictates training and certification, not just federal oversight; that such an interpretation renders § 1252c superfluous; that *Arizona* strongly indicates that detainers do not fall within the scope of permitted cooperation; and that the legislative history of § 1357(g)(10)(B) makes clear that Congress believed there was *no* local arrest authority outside of § 1357(g)(1) agreements. *El Cenizo*, 890 F.3d at 189. This Court was therefore right to rely on its own careful analysis, rather than defer to the unreasoned dicta in *El Cenizo*.

Because the federal statutory framework governing immigration arrest authority does not authorize ICE to ask the County to make immigration arrests for civil immigration violations, "Mr. Creedle has plausibly alleged" that ICE's issuance of detainers to the County fall "outside the scope of permissible 'cooperation' under Section 1357(g)," and therefore exceed ICE's statutory authority. *Creedle*, 349 F. Supp. 3d at 1304. The Court should reaffirm that conclusion here.

18

**B. Mr. Creedle has stated a claim that the Federal Defendants violated the Fourth Amendment by issuing detainers without probable cause.**

The Court should also reject the Federal Defendants' assertion that Mr. Creedle has failed to state a claim for declaratory relief against ICE's practice of issuing detainers to Miami-Dade County without probable cause.

The Federal Defendants first argue that because detainers simply *request* Miami-Dade County to arrest and detain people at ICE's behest, *ICE* does not "seize" anyone when it issues a detainer and, therefore, bears no responsibility for any Fourth Amendment violations that result. D.E. 134 at 15–16. But the Court has already correctly rejected ICE's effort to absolve itself of blame for the unlawful arrest and detention of a U.S. citizen because detainers are requests, rather than commands. *See Creedle*, 349 F. Supp. 3d at 1298–99. As the Court recognized, "ICE cannot issue a detainer that avers 'probable cause' to believe an individual is removable from the U.S., only to later disclaim all responsibility for that person's arrest when it turns out that the individual is a U.S. citizen." *Id*. at 1299 (citing *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Gonzalez v. ICE*, 2014 WL 12605368, at *5 (C.D. Cal. July 28, 2014)). Thus, if ICE issues detainers that result in arrests and detention that violate the Fourth Amendment, ICE can be held accountable for those constitutional violations.

Next, ICE argues that Mr. Creedle's Fourth Amendment claim fails "because an ICE detainer request evidences probable cause of removability in every instance." DE 134, at 18 (internal quotation marks and citation omitted). ICE's confident assertion that "every" detainer makes a constitutionally adequate probable cause showing clashes with the facts of this very case, in which ICE issued a detainer for a person it *knew was a U.S. citizen*. *See Creedle*, 349 F. Supp. 3d at 1299–300 (noting that "ICE has not yet proffered any facts regarding the agency's probable cause analysis . . . but to the extent that ICE relied on the fact that Mr. Creedle was born outside

19

of the U.S. to support a probable cause finding that he was removable, that basis, standing alone, is wholly insufficient as a matter of law").[12] Indeed, Mr. Creedle's case illustrates the defects in ICE's approach to detainer issuance, which has resulted in the wrongful arrest and detention of numerous U.S. citizens for immigration violations. *See Creedle*, 349 F. Supp. 3d at 1297–300 (comprehensively considering and rejecting the Federal Defendants' arguments that Mr. Creedle failed to state a claim for Fourth Amendment violations). The Federal Defendants' argument that detainers categorically establish probable cause should once again be rejected.

## CONCLUSION

For the foregoing reasons, the Court should deny the Federal Defendants' motion to dismiss Counts III and IV of Plaintiff's SAC.

---

[12] To be sure, the detainer form contains checkboxes, each of which contains a general statement which ICE *claims* is sufficient to establish probable cause. But, as Mr. Creedle alleges, "[d]etainer requests are not supported by probable cause in the form of a sworn statement of specific facts relating to the subject of the detainer." DE 116, ¶ 36. Because ICE does not establish "probable cause particularized with respect to th[e] person" who is the detainer's subject before the detainer is issued, the Federal Defendants' argument that *all* detainers categorically satisfy the Fourth Amendment's requirements must be rejected. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

Dated:  April 9, 2019                                    Respectfully submitted,

REBECCA SHARPLESS                                   AMIEN KACOU
Florida Bar No. 0131024                             Florida Bar No. 44302
ELIZABETH MONTANO,                                  ACLU FOUNDATION OF FLORIDA,
Law Student                                         INC.
IMMIGRATION CLINIC                                  4023 N. Armenia Avenue, Suite 450
UNIVERSITY OF MIAMI SCHOOL OF                       Tampa, FL 33607
LAW                                                 Tel: (813) 288-8390
1311 Miller Drive Suite E-
273 Coral Gables, Florida
33146 Tel: (305) 284-3576,
direct
Tel: (305) 284-6092, clinic
rsharpless@law.miami.edu

/s/ Ira J. Kurzban
IRA J. KURZBAN
Florida Bar No. 225517
KEVIN A. GREGG
Florida Bar No. 121852
EDWARD F. RAMOS
Florida Bar No. 98747
KURZBAN KURZBAN
TETZELI & PRATT, P.A.
131 Madeira Avenue
Coral Gables, FL 33133
Tel: 305-444-0060
Fax: 305-444-3503

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2019, I electronically served a true and correct copy of the foregoing on counsel for Defendants via transmission of a Notice of Electronic Filing generated by the CM/ECF system of the U.S. District Court of the Southern District of Florida.

/s/ Ira J. Kurzban
IRA J. KURZBAN

22