REBECCA SHARPLESS
Florida Bar No. 0131024
ROMY LERNER
Florida Bar No. 116713
UNIVERSITY OF MIAMI SCHOOL OF LAW
IMMIGRATION CLINIC
1311 Miller Drive Suite, E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576
Fax: (305) 284-6092

(additional counsel listed on next page)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:17-cv-22477-KMW**

GARLAND CREEDLE,

      Plaintiff,

v.

MIAMI-DADE COUNTY, Florida;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; and the
UNITED STATES OF AMERICA,

      Defendants.

_____/

**<u>RULE 26(a)(2)(B) EXPERT REPORT OF JOHN AMAYA</u>**

1

IRA J. KURZBAN
Florida Bar No. 225517
EDWARD F. RAMOS
Florida Bar No. 98747
KEVIN GREGG
Florida Bar No. 121852
ELIZABETH MONTANO
Florida Bar No. 1019260
KURZBAN KURZBAN TETZELI
& PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Tel: 786-401-4706
Fax: 305-444-3503

AMIEN KACOU
Florida Bar No. 44302
ACLU FOUNDATION OF FLORIDA, INC.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Tel: (813) 288-8390

DANIEL TILLEY
Florida Bar No. 102882
ACLU FOUNDATION OF FLORIDA, INC.
4343 W Flagler St Suite 400
Miami, FL 33134
Tel: 786-363-2714

*Attorneys for Plaintiff Garland Creedle*

## RULE 26(a)(2)(B) EXPERT REPORT OF JOHN AMAYA

I, John Amaya, hereby declare the following under penalty of perjury.

1. I make this declaration based on my own personal knowledge, and if called to testify, I would do so competently as follows:

**Qualifications**

2. I served as Deputy Chief of Staff for Immigration and Customs Enforcement (ICE) from May 18, 2015 until January 20, 2017. As Deputy Chief of Staff, I provided advice and legal counsel to agency Director Sarah R. Saldaña on all aspects of the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration.

3. I advised the Director on complex legal matters including federal-local cooperation on immigration enforcement, border security, removal operations, visa programs, family residential centers, worksite enforcement, financial crimes, export enforcement, trade-based money laundering, social media and cyber security, foreign corruption, and customs violations.

4. While at ICE, I worked on policies and problems relating to databases in several ways. First, I was part of a DHS team in charge of transitioning from the elimination of the Secure Communities Program to the implementation of the Priority Enforcement Program—both of which depended heavily on the issuance of detainers to local Law Enforcement Agencies (LEAs). Second, I engaged local elected officials across the country in efforts to regain their trust and return them to operational cooperation. Third, I participated in operational and policy discussions with leadership from ICE and other DHS components involving DHS databases.

5. Prior to serving as Deputy Chief of Staff for ICE, I served as Counselor to the Director, Leon Rodriguez, at U.S. Citizenship and Immigration Services (USCIS) from August 25, 2014 until May 18, 2015. Additionally, from April 5, 2010 until August 22, 2014, I served as senior counsel to the Chairman of the United States Senate Committee on the Judiciary where my areas of responsibility included DHS oversight. Finally, I began my career as a trial attorney with the U.S. Department of Justice, Office of Immigration Litigation, serving from 2006 to 2007.

6. I received my Bachelor's degree and my J.D. from the University of Washington, and my LL.M. from Georgetown Law. My resume is attached as Exhibit 1.

7. The Plaintiff has asked me to provide my opinions about whether the electronic immigration databases that ICE reviews prior to issuing immigration detainers are reliable sources of information about a person's immigration status such that a detainer issued on the basis of database checks alone could satisfy the Fourth Amendment's requirement that immigration arrests be based on probable cause.

8. Plaintiff has also asked me to provide my opinion about the significance of the detainer issued in Plaintiff's case and whether ICE is likely to issue an immigration detainer against Plaintiff again, should he be arrested in the future.

9. I may amend or supplement this report as appropriate.

**Basis of Opinions in this Report**

10. I have based the opinions expressed in this report on my experience working in DHS and as an immigration lawyer, as well as the documents listed in the addendum to this report.

**Policies Related to ICE Detainers**

11. The Secure Communities Program started in 2008 to quickly identify and take into custody people held in local or state jail who are suspected of being amenable to removal from the United States, either because they lacked immigration status or were subject to a criminal or other ground of removal.

12. Technology made Secure Communities possible. When a person is arrested and their fingerprints taken at an LEA, those fingerprint records are transmitted to the FBI for an automated comparison against DHS databases. If a "hit" is generated, ICE runs database searches to determine whether to issue a detainer.

13. Secure Communities transformed the way ICE identified, and lodged detainers on suspected noncitizens who were thought to be amenable to removal.

14. Prior to Secure Communities, the Criminal Alien Program (CAP) would use a combination of interviews, Alien file (A-file) review, and manual database searches before deciding whether to issue a detainer.

15. A-files are the files created for certain classes of lawful immigrants as well as suspected immigration violators, which are intended to contain all relevant papers and information related to a person's immigration case, including documents from removal proceedings and applications for immigration relief. The A-file is a critical source of information about a person. Standard practice is for no court proceeding or benefits adjudication to move forward without the A-file. These files are paper files and are not available for electronic review.

16. While A-file review and interviews are still possible after Secure Communities, many detainers are issued based on database checks alone. Because the goal of Secure Communities is to prevent a suspected immigration law violator from bonding out or otherwise being released from local custody, the emphasis is on lodging detainers quickly.

17. In 2014, ICE discontinued Secure Communities because of, among other things, criticism that the program was sweeping too broadly and resulting in the deportation of individuals who were not priorities for removal, such as individuals convicted of minor driving-related offenses.

18. In its place, ICE implemented the Priority Enforcement Program (PEP). The technology driving this program was the same as for Secure Communities. However, unlike Secure Communities, PEP was targeted at individuals who were priorities for removal because of the more serious nature of their criminal convictions.

19. PEP remained in place during the Obama Administration and for the first part of the Trump Administration. However, the Trump Administration reverted back to Secure Communities in January 2017.

20. The underlying technology regarding the fingerprints and the use of databases to issue detainers has remained largely the same since the initial Secure Communities program.

**Databases Used to Issue Detainers**

21. There is no single, unified database that underlies the issuance of detainers. The databases are a patchwork of different systems maintained by different components of the Department of Homeland Security, including ICE, Customs and Border Protection (CBP),

and U.S. Citizenship and Immigration Service (USCIS). Additionally, other databases are maintained by agencies outside of DHS, like the State Department.

22. While officers who issue detainers may have access to an array of different databases, there are four primary DHS databases that ICE uses to determine alienage and whether a person is subject to removal before issuing an immigration detainer. They are Central Index System (CIS) and CLAIMS, which are maintained by USCIS, ICE's EARM/EAGLE database, and CBP's database TECS.

23. The databases are often incomplete, contain contradictory information, are not updated uniformly, and lack comprehensive sources of information about citizenship and immigration status. Government reports have documented the lack of accuracy, timeliness and completeness of the databases.

24. The immigration databases, when not used in combination with A-files or interviews, are not reliable sources of information about whether a person is a noncitizen who is amenable to removal.

25. The role of human error and discretion when inputting database information and then interpreting, and making inferences about, the information also makes the database-checking process unreliable.

26. In addition, determinations about whether someone is a noncitizen and whether the person is amenable to removal are complex. Immigration law is complicated and immigration status is not static.

**Foreign-Born U.S. Citizens**

27. No database contains the names of all foreign-born United States citizens. Because there are multiple databases used to issue detainers and there is often no, or conflicting, information about whether or not a person is a U.S. citizen, it is difficult to assess whether someone is a citizen from databases alone. Moreover, the databases lack the information needed to determine whether or not a person acquired or derived citizenship through their parent(s), as described below.

28. Supervisors and officers in the field are skeptical of claims to U.S. citizenship and often do not credit them. As a result, even if there is some indication in a database that a person could be a U.S. citizen, this skepticism sometimes causes officers to ignore this information.

29. This reality leads to erroneous detainers being issued for individuals who are U.S. citizens.

30. There are three scenarios in which a person born abroad may be a U.S. citizen. First, a person may acquire citizenship at birth through one or both of their U.S. citizen parents. The rules for determining whether one or both U.S. citizen parents transmit citizenship to a child at birth are defined by statute and have changed considerably over time, making the determination of whether a person is a citizen by birth complex.

31. The rules usually require investigation into whether the U.S. citizen parent or parents spent their formative years in the United States, among other factors. In some cases, it is possible to derive citizenship through one's grandparent(s), if citizenship was passed down to a parent.

32. Not only do the databases used to issue detainers lack the names of people who have acquired U.S. citizenship, but they lack the underlying information needed to conduct the acquired citizenship analysis (for example, full names of parents, parents' citizenship at time of the child's birth, time parents lived in the United States, names and information regarding grandparents). As a result, it is impossible to determine whether a person has acquired U.S. citizenship through a database check alone.

33. If a person acquires citizenship, they are a U.S. citizen as of the moment of their birth. Nothing requires that people who acquire U.S. citizenship apply for proof of citizenship. But they can apply for proof of their citizenship through a U.S. Consulate abroad or by submitting an N-600 Application for Certificate of Citizenship with USCIS. They can also apply for a U.S. passport through the U.S. Department of State.

34. Because there is a long backlog in the adjudication of N-600 Certificate of Citizenship applications, people sometimes prefer to apply for a U.S. passport. But since passport applications are not filed with DHS, no DHS database has a record of them.

35. Although people who acquire citizenship are citizens from the time they are born, they may refrain from identifying themselves to authorities as official U.S. citizens until they have been granted proof of their U.S. citizenship, such as a U.S. passport or Certificate of Citizenship.

36. The second way of becoming a U.S. citizen is through derivation. Under the current rules for derivation, a child under the age of 18 becomes an automatic citizen if he is a lawful permanent resident before he turns 18 and at least one custodial parent naturalizes before

he turns 18. Upon the last condition being met, the child is an automatic citizen as of that date. The rules for derivation have changed over time.

37. Determining whether a person acquired or derived citizenship through a parent is complicated both in terms of the law and the facts. The analysis requires information that is often not available in any government database. It is generally not possible to even identify through database searches the possibility that a person could be an acquired or derivative citizen because the databases do not contain the needed information about the person's parents. Databases are not linked such that information about parents is readily obtainable. Information about U.S.-born citizen parents is not in any DHS database.

38. The third way of becoming a U.S. citizen is through the naturalization process. This route to citizenship requires that a person be over 18, be a lawful permanent resident for a specified number of years, be a person of good moral character as defined by statute, meet physical presence and residence requirements, and take an oath of allegiance. Unlike acquisition and derivation, a person does not become a U.S. citizen through naturalization until the application is approved and an oath taken.

39. The number of foreign-born U.S. citizens is sizable. The 2015 U.S. Census Bureau counted 2.7 million people in the United States who are foreign-born U.S. citizens.

40. Given the above, ICE officers who rely only on database checks to determine immigration status can easily make a mistake and issue detainers on U.S. citizens. I know that these mistakes occur through my work at ICE.

41. In 2015, ICE issued a memorandum entitled "Investigation of the Potential U.S. Citizenship of Individuals Encountered by ICE" in an effort to guard against the wrongful

issuance of detainers against U.S. citizens. The memo cautions ICE officers tasked with issuing detainers to be on the lookout for multiple indicia of U.S. citizenship and to investigate with care any claim to U.S. citizenship.

42. The citizenship memo lists numerous indications of possible U.S. citizenship. But the databases do not contain the vast majority of information needed to screen for the listed indicia of U.S. citizenship. As a result, officers cannot comply with the citizenship memo based on database checks alone.

43. Although the memo indicates that ICE was trying to fix the problem, the problem was not remedied because of the underlying database issues.

**Determining Removability of Non-citizens**

44. In my experience, detainers based on database checks alone are also unreliable for determining whether individuals known to be noncitizens are amenable to removal.

45. Because the law is complicated and there are many different types of immigration status, which can shift over time, it is difficult to determine when an individual has lawful immigration status in the United States. The Immigration and Nationality Act (INA), contains no definition of when an individual has lawful immigration status or unified list of types of lawful status.

46. In general, an individual's immigration status refers to the classification under which a person was admitted into the United States, if they were admitted. "Non-immigrants" are people admitted temporarily, such as tourists, students, or people on temporary work visas. "Immigrants" are permanent residents.

11

47. But there are many other classifications established by federal law, such as temporary protected status, and categories of individuals who may have no statutory immigration status but whose presence in the United States is nonetheless authorized.

48. At any given time, there are millions of foreign-born persons in the United States who hold nonimmigrant visas.  The INA enumerates twenty-three (23) types of non-immigrant visas that allow non-citizens and their dependents to enter or remain in the United States for varying lengths of time. *See* 8 U.S.C. § 1101(a)(15)(A)–(V). There are separate rules and guidelines for each type of nonimmigrant visa that govern their granting, extension, and termination. In most cases, USCIS has the authority over these decisions. A person is generally considered to still be in status if they apply for a timely extension. Another complication is that sometimes the duration of a visa is not apparent from its face. People might be admitted for "the duration of their status."

49. ICE has no role in the issuance, extension, or termination of a non-immigrant visa.

50. USCIS is supposed to update and maintain the databases CLAIMS and CIS with the current information about non-immigrant visas, including extensions and requests for extensions. Many people who work under the auspices of USCIS, including independent contractors, have update authority for these databases.

51. An enduring problem is that there are many errors, missing information, and inconsistent information in the USCIS-maintained databases. There is as a result a high degree of unreliability in what is entered into the databases on non-immigrant visa status and the format in which it is entered.

52. Information from immigration court regarding the disposition of immigration court proceedings, and the underlying reasons for them, is not directly available to officers who make the decisions about whether to issue a detainer. Immigration courts do not have a universal electronic filing system. There is no way for an officer who is deciding whether or not to issue a detainer to electronically check the court docket to see the documents filed, and orders issued, in immigration court. The database used by the prosecuting attorneys in immigration court is also not accessible to the officers making detainer decisions. In many cases, the only source of information regarding an immigration court proceeding comes from notes that another deportation officer would make in an ICE database. These notes might not exist and, if they do, may not be updated or accurate. Moreover, it is up to the discretion of the officer issuing the detainer whether to rely upon those notes.

53. If a noncitizen wins permanent status in immigration court, it may take months or longer for USCIS to record that status, as it does so only when it processes actual proof of the status, such as a lawful permanent resident card.

54. Officers who search databases to issue detainers also may be unaware of the status of individuals granted relief based on a fear of returning to their home countries, called asylum, withholding of removal, or relief under the Convention Against Torture. Individuals granted these types of relief are issued written decisions by immigration judges. As stated above, the officers who issue detainers do not have electronic access to the decisions of immigration judges and must rely upon notes by other ICE deportation officers, which do not always exist and may not be accurate.

55. In the case of court proceedings that are terminated because the immigration judge found that the person is a U.S. citizen, the judge has no authority to issue the person a certificate

of citizenship or a U.S. passport. These documents must be obtained through USCIS or the U.S. Department of State.

56. USCIS does not automatically process the person for proof of U.S. citizenship or update the databases that they control to reflect that a person was found by the judge to be a U.S. citizen. ICE also does not necessarily update their databases. Even if some databases are updated, other databases may continue to display information that suggests that the person is not a U.S. citizen, making it possible for an officer to erroneously issue a detainer.

57. People who lose their cases before the immigration judge have the right to file an administrative appeal to the Board of Immigration Appeals. If the Board reverses the decision and remands the case for issuance of permanent residency or other status like asylum, the officers searching the databases would not necessarily see this information.

58. If the Board denies the appeal, the person usually has the right to file a petition for review before a U.S. Court of Appeals. If an appellate court reverses and remands the Board's decision, the officers would also likely not learn about this information from the databases because there is no DHS database of these judicial proceedings.

**Date Restrictions of Database Information**

59. The databases only contain information dating from the time that DHS started maintaining information electronically, as opposed to just in the person's A-file. As a result, information relating to older adjudications and decisions does not exist in the databases.

**Errors in the Databases**

60. DHS databases contain many errors, missing information, and inconsistent information. The information in the databases is only as reliable as the accuracy of the information being

14

entered and the accuracy of its entry into the system. There are many sources of human error.

61. One issue is the entry of foreign names, especially multiple last names and changes of names due to marriage or other events.

62. Another issue is misspellings. For example, "Gonzalez" could be entered as "Gonzales."

**Opinion as to Reliability of Biometric Search Only Detainers**

63. For the reasons stated above, it is my opinion that detainers issued solely on the basis of a biometric (database) check, without an interview or review of the physical A-file, are unreliable.

**Opinion as to Detainer Issued Against Garland Creedle and Likelihood of His Re-Arrest On Future Detainer**

64. It is my opinion that the detainer issued by ICE against Garland Creedle on May 13, 2017 is an example of the unreliability of detainers issued on the basis of database checks alone.

65. In Mr. Creedle's case, there were indications in the databases that he was a U.S. citizen, including notes from a deportation officer that court proceedings had been terminated and a note that Mr. Creedle had made a claim to U.S. citizenship. The fact that he was detained despite these indicia of U.S. citizenship illustrates the role of discretion and human error in the process of issuing detainers.

66. I understand that Mr. Creedle was arrested in Miami in 2018 and that ICE did not issue a detainer against him on that date. I further understand that, as a result of this lawsuit, ICE has put additional notations in databases pertaining to Mr. Creedle stating that he is a U.S. citizen, including on the Immigrant Alien Response (IAR) form.

67. It is nonetheless my opinion that Mr. Creedle could be subject to another detainer in the future. Whether or not ICE detains him in the future will depend on many factors, including but not limited to which officer, or officers, reviews the databases and what inferences are made from the databases that the officer chooses to review. Based on my experience, there is a high level of discretion involved in deciding whether to issue a detainer.

68. I have reviewed the heavily redacted documents that I understand were provided to Mr. Creedle's legal team on December 3, 2019, marked CBP 29-34. These appear to be screenshot printouts dated September 18, 2019 from the database US VISIT. They show that Mr. Creedle's citizenship is variously recorded as "no data" or "HND," for Honduran.

**Compensation and Prior Testimony**

69. I am not receiving any compensation for my services as an expert witness in this case. I have agreed to serve as an expert on a pro-bono basis for all work in this matter, including deposition and trial testimony. I am subject to reimbursement for all reasonable expenses incurred in the course of my work on this case, if any, such as travel expenses, including the actual costs of transportation, meals and lodging.

70. I have not testified as an expert at trial or by deposition during the previous 4 years.

I declare under penalty of perjury of the laws of Washington DC and the United States that the foregoing is true and correct. Executed this 19th day of December 2019 in Washington, DC.

JOHN AMAYA

**<u>Addendum</u>**
**List of Documents Reviewed**

**Exhibit Nos.:**

1.  John Amaya - Resume
2.  Memorandum Investigating US Citizenship Claims
3.  Central Index System Search (09/18/2019)
4.  G116, Report of Investigation
5.  I-213, Record of Deportable Inadmissible Alien (10/21/2014)
6.  Email from Alexander Martinez to ICE-ERO Regarding Detainer (03/13/2017)
7.  Email from Alexander Martinez to ICE-ERO Regarding Detainer (03/17/2017)
8.  Immigration Court Decision and Motion to Terminate (04/30/2015)
9.  EARM Case Summary
10. CPMS Query Summary View
11. CPMS Details
12. CIS Search
13. Person Details
14. Immigration Alien Response from LESC
15. Declaration of Assistant Field Office Director Garrett J. Ripa (12/21/2018)
16. EARM Case Event Management, Case Actions, and Decisions
17. Excerpt of PCQS508, IDENT Details
18. Excerpt of Immigration Detainer
19. Updated IAR Listing Plaintiff as U.S. Citizen
20. U.S. Visit Details
21. U.S. Passport Info
22. EARM Person Details